HARRY C. FISHER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 53229.   Promulgated February 7, 1934.

*Charles E. Kelly, Esq.*, and *Edward V. McKeown, Esq.*, for the petitioner.

*C. H. Curl, Esq.*, for the respondent.

1044

OPINION.

ARUNDELL: The first question is whether the income carried through the partnership books in 1925 was in reality partnership income and distributable among petitioner, his father, and his mother, or whether it was income to petitioner alone and taxable to him.

The respondent allowed the income to be divided in prior years and petitioner places stress on this as overcoming the presumptive correctness of respondent's determination for 1925. We do not know what facts were presented as to the prior years, but, whatever they were, the findings for the prior years do not preclude the respondent from reaching a different conclusion for the current year either on questions of fact, *Carney Coal Co.*, 10 B.T.A. 1397, 1404, or law, if the prior interpretation is erroneous, *Basil Robillard, Executor*, 20 B.T.A. 685; affd., 50 Fed. (2d) 1083.

Petitioner's contention throughout the trial of this case is that the first question for decision is limited to the narrow issue of whether a partnership existed in 1925. Two errors are alleged in respect of the partnership matter. First, the respondent erred in determining " that no valid partnership existed during the year 1925," and, second, that he " erred in increasing the net income reported by the petitioner in the amount of $111,149.79." Both of the alleged errors are denied by the respondent.

One of the first steps in petitioner's proof was establishing that under the laws of New York a partnership may continue without express agreement beyond the time fixed for its termination. The statutes of New York provide that in such cases "the rights and duties of the partner remain the same as they were at such termination." McKinney's Consol. Laws, Book 48, sec. 45. But we do not understand the question before us to be solely that of whether there was a partnership in 1925. Even though there was a valid partnership, it does not follow that all of the amounts recorded on its books constituted income to it. The issues framed by the two allegations of error, particularly the second, and the denial thereof, take the question out of the narrow range suggested by petitioner and require a determination of whether the income was in reality petitioner's or that of the alleged partnership.

We have in this case a great mass of documentary evidence, all of which, summarized, merely tends to show that there was a partnership agreement and that records were kept in partnership form. There is no evidence tending to show a contribution by petitioner's father and mother of either property or services to the enterprise conducted under the name of Fisher & Fisher. "The requisites of a partnership are that the parties must have joined together to carry on a trade or adventure for their common benefit, each contributing property or services, and having a community of interest in the profits." *Meehan* v. *Valentine*, 145 U.S. 611, quoted in *Schumacher* v. *Davis* (Dist. Ct., E. Dist. New York), 1 Fed. Supp. 959. See also *George M. Cohan*, 11 B.T.A. 743; affd. on this point, 39 Fed. (2d) 540. Here, none of the so-called partners contributed any services. Petitioner said that he brought his father in because he needed ideas, and that his mother did the bookkeeping, but the record contains no evidence of the contribution of ideas by the father, and it appears that the books were kept by a firm of certified public accountants. It is argued that the father and mother contributed capital by reason of their ownership of interests in the two corporations which preceded Fisher & Fisher. The evidence as to their interests in the corporations is decidedly unsatisfactory. The stock records of the corporations were not produced and petitioner's attorney who organized the corporations testified that he had never seen the stock records. He further testified that he knew that the stock was equally divided among the three. It seems to us that, confronted with a question as to the source of property from which income was derived, a clearer showing than this ought to have been made. The failure to produce the corporate records was not even explained.

The evidence as to the contributions of petitioner himself is likewise vague. It is clear that he performed no services for Fisher & Fisher in the taxable year. The firm's operations were conducted

wholly by paid employees. There has been no record produced of petitioner's assignment of his interest in the Mutt and Jeff cartoons to the partnership. There is some testimony that the cartoons had not been successfully copyrighted, but it must be assumed that petitioner somehow had the exclusive right to the cartoons and the characters portrayed, else he could not have commanded the high prices paid by the syndicate and others for the right to publish or otherwise use them. Petitioner originated the cartoons, and, as far as the record shows, had a property right therein throughout the years. Under the contract of January 3, 1921, with the syndicate, the petitioner was personally obligated to supply the cartoons. No mention is made of a partnership in that contract, and clearly under it the income was petitioner's. It is not until December 12, 1923, that we find the partnership mentioned in connection with the contract, when by endorsement on the contract it is stated that it had " been assigned by the party of the second part to the partnership of Fisher and Fisher." But thereafter, and through the taxable year, petitioner took for his own use the bulk of the income alleged to belong to the partnership. His conduct in this respect, and the apparent acquiescence of the father and mother, strongly indicates that all three continued throughout to regard the cartoons and contracts as property of the petitioner and that the others had no substantial interest therein. He not only drew in full the one third claimed to be his share, but took out substantial sums which he alleges belonged to his father and mother. Each year he did so, and by the end of 1925 he had taken out $374,091.43 more than what he now says was his. This huge overdraft he has never repaid, though subsequent credits to his account have reduced it to $123,759.67. By far the greater part of the reduction appears to be due to petitioner's inheritance of his father's estate. The value of decedent's estate as returned for estate tax purposes was $253,466.86, from which deductions of $14,707.82 were claimed, leaving a net amount of $238,759.04. The total reduction of the overdraft amounts to $250,231.76.

It is inconceivable that a bona fide business partnership would be conducted in this way. On the one hand, we have a written document declaring three persons to be equal partners; on the other, there is the conduct of the parties, which in no respect is that of equal partners. He who created the property from which income is derived continues to enjoy that income. While the parties to the agreement, on the strength of it alone, might have compelled an accounting, this does not prevent the Government from inquiring into the practical questions of the source and recipient of income. When the true facts as to source and destination are disclosed " no distinction can be taken according to the motives leading to the

arrangement by which the fruits are attributed to a different tree from that on which they grew." *Lucas* v. *Earl*, 281 U.S. 111.

*Peyton* v. *Gordon*, 246 N.Y. 213; 158 N.E. 77, cited by petitioner, has this to say on the question of whether a partnership existed:

Assuming some written contract between the parties, the question may arise whether it creates a partnership. If it be complete, if it expresses in good faith the full understanding and obligation of the parties, then it is for the court to say whether a partnership exists. It may, however, be a mere sham intended to hide the real relationship. Then other results follow. In passing upon it, effect is given to each provision. Mere words will not blind us to realties. Statements that no partnership is intended are not conclusive. If as a whole a contract contemplates an association of two or more persons to carry on as co-owners a business for profit, a partnership there is. Section 10. On the other hand, if it be less than this, no partnership exists. Passing on the contract as a whole, an arrangement for sharing profits is to be considered. It is to be given its due weight. But it is to be weighed in connection with all the rest. It is not decisive. It may be merely the method adopted to pay a debt or wages, as interest on a loan or for other reasons.

In the case before us the form of the written agreement was that of an association " to carry on as co-owners a business for profit." But the realities of the case are far different from the form of the contract as above pointed out. There was an ostensible " arrangement for sharing profits ", but this, as we have seen, was utterly disregarded, and when it is " weighed in connection with all the rest " it is found wanting as a true expression of the intent of the parties to the agreement.

Arrangements within families for the diversion of income, while not necessarily subject to condemnation because of the close relationship of the parties, are always subject to careful scrutiny and clear and convincing evidence is required to establish their bona fides. See *P. B. Fouke*, 2 B.T.A. 219; *James L. Robertson*, 20 B.T.A. 114. It is helpful in such cases to have the background of the transaction that is under review and evidence of the actual operation through the testimony of the participants. In this case neither the petitioner nor his mother was called as a witness on the partnership question, although the presiding Member, during the trial, clearly expressed his view that such testimony was desirable as a possibly important element in the decision of the case. Near the close of the trial petitioner was called as a witness on another issue, and, when counsel for respondent attempted to cross-examine him on the partnership matter, counsel for petitioner objected and insisted that for any examination on that question the petitioner became a witness for respondent. The only testimony given by petitioner respecting the partnership was elicited by the presiding Member.

If, as alleged, the three were equal partners, the dissolution of the firm would seem to be an appropriate time for the casting up

of accounts and a division of the property. But no such division was made. A part of the property was transferred to what is called a joint account. This, as we understand it, reflected petitioner's overdrafts. He neither then nor later repaid to the other two their shares. The rest of the property, consisting of three contracts, was assigned to the corporation organized to succeed to the business of Fisher & Fisher. If the three were equally interested in the partnership it would seem, in the absence of any other agreement, that their interests would be the same in the corporation. The evidence as to how the stock of the corporation was distributed is not at all satisfactory. The instrument of assignment of the three contracts to the corporation recites a consideration of 75 shares of stock of the new corporation. It does not appear that these shares were distributed to the three individuals, either directly or carried into the joint account established upon dissolution of the partnership. In the estate tax return filed by petitioner as executor of his father's estate, the father is shown as owning but one share of the stock. In the income tax return of Fisher & Fisher, Inc., for 1926, executed by petitioner as president and treasurer, it is stated that petitioner owned 98 shares of stock and his father and mother one share each. At the trial of this case petitioner testified that his father and mother each owned one third of the 100 shares of capital stock of the corporation. Here again we feel that more reliable evidence might have been produced by the petitioner. The attorney who tried this case for petitioner was active in the organization and operation of the corporations preceding and the one succeeding Fisher & Fisher, and must be presumed to have access to the corporate records. Upon the record before us, confused as it is on this question, we are unable to make a definite finding as to who received the stock of Fisher & Fisher, Inc.

It is accordingly our conclusion that the partnership agreement did not reflect the true relation of petitioner, his father, and his mother; that, having regard to the substance of the matter rather than the mere form of the written instrument and bookkeeping entries, there was no bona fide partnership; that petitioner was the real owner of the income-producing property and the income in the first instance was his and taxable to him.

The second question is whether the loss sustained in the operation of petitioner's racing and breeding stables is deductible. Petitioner cities several cases in which losses incurred in operating stables have been allowed. See *George D. Widener*, 8 B.T.A. 651; affd.. 33 Fed. (2d) 833; *Margaret E. Amory*, 22 B.T.A. 1398; *James Clark*, 24 B.T.A. 1235; *Marshall Field*, 26 B.T.A. 116; affd., 67 Fed. (2d) 876. In all of the cases cited it was found that the stable had been created with the expectation of making profits. For example, in the *Field*

case, the court points out that the taxpayer testified that he established his stables "with a serious and business-like desire to make his operation profitable" and that "it was his intention to give up the enterprise if it was not successful in making money." We have no such evidence here. We know nothing of petitioner's object in embarking upon the hazardous enterprise of breeding and training horses for the race track. The substance of the evidence before us is that petitioner required detailed records to be kept of the cost of operating stables, and that he personally attended to a number of matters, such as the purchase and sale of horses and the selection of those to be entered in races. This evidence is insufficient to overcome the presumptive correctness of the respondent's determination. The keeping of accounts does not in and of itself demonstrate the object of an enterprise. And so as to the personal attention given to some phases of the stables, their operation as a hobby or pleasure would not preclude his giving them his attention. The evidence does not convince us that the stables were operated for profit and the deduction claimed cannot be allowed.

Reviewed by the Board.

*Decision will be entered for the respondent.*