J. W. Hughes v. Commissioner.
J. W. Hughes v. Commissioner
Docket No. 3504.
United States Tax Court
1945 Tax Ct. Memo LEXIS 241; 4 T.C.M. (CCH) 382; T.C.M. (RIA) 45127; April 12, 1945
R. Emerson Gardner, Esq., 911 The First Nat. Bank Bldg., Atlanta, Ga., for the petitioner. Bernard D. Hathcock, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: This case involves a deficiency in income tax for the calendar year 1940. Deficiency was determined in the amount of $3,795.37. The only remaining issue for consideration is whether the Commissioner erred in including in petitioner's gross income dividends of $8,250 on 82 1/2 shares of the stock of Southeastern Stages, Inc.
Findings of Fact Petitioner's income tax return for the calendar year 1940 was filed with the collector of internal revenue for the district of Georgia. On April 21, 1930, White Stage Lines, a corporation, was duly organized under the laws of the State of South Carolina by petitioner *242 and his wife, Mrs. L. L. Hughes. The corporation's authorized capital stock consisted of $5,000 divided into 100 shares of $50 par value each. It was organized to engage in the general motor bus transportation business. Petitioner spent several hundred dollars obtaining a Certificate of Public Convenience and Necessity. Ninety-nine shares of stock were issued in the name of petitioner's wife and one share in the name of petitioner. The only asset the corporation had at the time it commenced business was a seven-passenger automobile for which petitioner paid $1,600, of which $1,000 was paid in cash. This $1,000 was part of $2,150 which had belonged to petitioner's wife and which she made available to petitioner for the purpose of organizing the corporation and starting its business. The White Stage Lines started operations with one vehicle, and petitioner did all the corporation's work, such as driving, washing and greasing the car. The records were kept by R. M. Medlock. Although White Stage Lines continued to operate until the end of 1933, the only available records pertaining to its operations are the following: (1) The original stock certificates issued to petitioner and his wife; *243 (2) a copy of its annual report to the railroad commission of South Carolina; (3) a copy of its South Carolina State income tax return for the calendar year 1931; and (4) a certified copy of its charter. On December 27, 1933, the stockholders of Southeastern Stages, Inc., a Georgia corporation (hereinafter sometimes referred to as Southeastern), and the stockholders of White Stage Lines, entered into a contract to be effective on January 1, 1934, which provided in part as follows: "3rd. It is mutually agreed by and between the parties that the parties of the second part [the stockholders of White Stage Lines] will and does hereby sell to the parties of the first part its entire capital stock, together with all equipment of every kind and description. "4th. It is agreed by and between the parties that upon the completion of said transfer that each of the parties hereto will own and have issued to them the following amounts of stock in the Southeastern Stages, Inc.: "1/3
of said stock to Chas. W. Brega.
1/3
of said stock to Evelyn G. Walton and
R. O. Walton.
1/6
of said stock to A. C. Shipman, O. D.
Shipman and B. C. Shipman.
1/6
of said stock to J. W. Hughes and Mrs.
J. W. Hughes."
*244 This merger was negotiated on behalf of White Stage Lines by petitioner and acquiesced in by his wife. Only the duplicate copy of the original contract was available and it was signed by petitioner on behalf of both his wife and himself. The stock certificate in White Stage Lines, Inc., for 99 shares to Mrs. Hughes bears her endorsement dated January 1, 1934, to Southeastern. On December 30, 1933, the following resolutions were passed at a meeting of the stockholders of Southeastern: "2. That the stock in said Southeastern Stages, Inc. be re-issued upon the following basis and each stockholder in said Southeastern Stages have issued to them the following numbers of Shares: "Mrs. Evelyn G. Walton
166 2/3 shares
Chas. W. Brega
166 2/3 shares
A. C. Shipman
83 1/3 shares
J. W. Hughes
83 1/3 shares
"Total
500 shares" Petitioner was elected a director of Southeastern at this stockholders' meeting; and, on the same day at a meeting of the directors of Southeastern a motion was adopted approving the consolidation and taking over of White Stage Lines and directing the president and secretary of Southeastern to re-issue the shares of the latter's stock in accordance *245 with the resolution set forth above. On January 1, 1934, certificate No. 10 for 83 1/3 shares of the capital stock of Southeastern was issued in the name of J. W. Hughes. The balance of the 500 shares of Southeastern's stock was issued at the same time in the following manner: 166 2/3 to E. G. Walton (certificate No. 7), 166 2/3 to C. W. Brega (certificate No. 8), and 83 1/3 to A. C. Shipman (certificate No. 9). On June 2, 1934, R. M. Medlock became secretary of Southeastern and on that day petitioner gave Medlock one share of Southeastern's stock. This was accomplished by canceling certificate No. 10 and issuing in its place certificate No. 13 for one share to R. M. Medlock and certificate No. 14 for 82 1/3 shares to J. W. Hughes. Also, on June 2, 1934, certificates No. 7 and 8 were canceled and in their place certificates No. 11 and 12 each for 166 2/3 shares and each in the joint names of A. C. Shipman and J. W. Hughes were issued. Certificates No. 11 and 12 were replaced on December 30, 1938, by certificate No. 15 for 166 2/3 shares in the name of A. C. Shipman and by certificate No. 16 for 166 2/3 shares in the name of J. W. Hughes. Also on December 30, 1938, certificate No. *246 16 was canceled and in its place certificate No. 17 for 16 2/3 shares was issued in the name of J. W. Hughes and certificate No. 18 for 150 shares in the name of J. W. Hughes, as trustee under agreement dated December 30, 1938. By that agreement petitioner had named himself trustee for the benefit of his children. The Bureau of Internal Revenue ruled on August 24, 1940, that the income from that trust was taxable to petitioner and on December 10, 1940, certificate No. 18 was canceled and certificate No. 23 for 150 shares was issued in the name of J. W. Hughes. Certificate No. 13 for one share of stock has remained in the name of R. M. Medlock at all times. Certificate No. 14 for 82 1/3 shares continued to stand in the name of J. W. Hughes until April 1, 1940, when it was canceled together with certificate No. 17. In place of certificates No. 14 and 17, certificate No. 21 for 82 1/2 shares was issued in the name of Lessie Louise Hughes, petitioner's wife, and certificate No. 22 for 16 1/2 shares was issued in the name of J. W. Hughes. On the same day, April 1, 1940, certificate No. 9 for 83 1/3 shares standing in the name of A. C. Shipman was canceled and in its place certificate *247 No. 19 for 75 shares was issued in the name of Era Irene Shipman and certificate No. 20 for 8 1/3 shares was issued in the name of A. C. Shipman. Certificate No. 21 for 82 1/2 shares continued to stand in the name of petitioner's wife until November 20, 1942, at which time it was canceled. In its place, certificate No. 27 for 70 1/2 shares was issued in the name of Lessie Louise Hughes and the remaining 12 shares were divided as follows: 6 shares in certificate No. 25 (for 40 shares) standing in the name of Mary Louise Hughes and 6 shares in certificate No. 26 (for 40 shares) standing in the name of William Cofer Hughes. Mary Louise Hughes and William Cofer Hughes are the children of petitioner and his wife. Certificate No. 27 for 70 1/2 shares standing in the name of petitioner's wife was canceled on August 30, 1943, and in its place certificate No. 37 for 28 1/2 shares in her name was issued. The balance of 42 shares is included in certificate No. 33 (for 200 shares) which was issued in the name of Atlantic Greyhound Corporation on August 30, 1943. The sale of these 42 shares standing in the name of petitioner's wife was handled on her behalf by petitioner. The proceeds of $79,800 *248 was placed to the credit of stocks in Mrs. Hughes' journal and deposited in August 1943 in her account in the Citizens and Southern National Bank. After petitioner and A. C. Shipman purchased the shares of E. G. Walton and C. W. Brega on June 2, 1934, 100 per cent of Southeastern's capital stock stood in equal amounts in the name of A. C. Shipman (and members of his family) and in the name of J. W. Hughes (and members of his family, including R. M. Medlock), until August 30, 1943. After August 30, 1943, three-tenths of Southeastern's common stock stood in the name of A. C. Shipman and members of his family and three-tenths in the name of J. W. Hughes and members of his family; the remaining two-fifths of Southeastern's common stock was owned by the Atlantic Greyhound Corporation. Prior to April 1, 1940, the directors of Southeastern, one of whom was petitioner, declared dividends on its common stock on the following dates and in the following amounts: Date
Date
Amount Per
Declared
Payable
Per Share
82 1/2 Shares
11/11/36
12/ 5/36
$42.85
$3,535.13
4/20/37
4/24/37
26.00
2,145.00
12/15/37
12/30/37
27.00
2,227.50
12/31/38
12/31/38
72.00
5,940.00
$13,847.63
*249 The dividends thus declared were paid to J. W. Hughes without restriction as to their use by him. The proceeds from the 1936 dividend and the two dividends for 1937 were deposited in petitioner's account in the Fulton National Bank at Atlanta, Georgia. The 1938 dividend was paid by notes of Southeastern which were paid on July 1, 1940, by a preferred stock issue. The dividends, received by petitioner during the years 1937 and 1938 on stock standing in his name in Southeastern were reported in his income tax returns for those years, as his own income and those returns were sworn to as being true returns. The opening entry in petitioner's books lists 82 1/3 (sic) shares of Southeastern as part of his assets. On or about October 16, 1939, in connection with an application for a loan from the Fulton National Bank, petitioner submitted a statement of his assets and liabilities as of that date and in that statement, which he certified to be true and correct, he represented himself as being the owner of 99 shares of stock of Southeastern. These 99 shares consisted of certificate No. 17 for 16 2/3 shares and certificate No. 14 for 82 1/3 shares. The latter certificate, No. 14, covered 82 1/3 of *250 the 83 1/3 shares which had been issued to him on January 1, 1934, with the original certificate No. 10. A similar statement made April 22, 1942, does not list any of the shares originally represented by certificate No. 10 as part of petitioner's assets as of December 31, 1941. Another dividend of $100 per share was declared on Southeastern's common stock at a meeting of the directors, at which petitioner was present, held on November 28, 1940. This dividend was payable on December 16, 1940, to stockholders of record on that date and payment was to be made in promissory notes of the corporation. A demand note dated December 16, 1940, in the amount of $8,250 was drawn by Southeastern to the order of Lessie Louise Hughes. That note was paid in full with interest to her by two checks, one for $3,000 dated June 14, 1941, and the other for $5,557.96 dated July 7, 1941. The proceeds were deposited in her account in the First National Bank of Atlanta and subsequently part thereof was transferred by her to her children as a gift. Petitioner has not received any dividends on these 82 1/2 shares of stock since April 1, 1940. As of March 10, 1941, Mrs. Hughes' debit balance in petitioner's *251 ledger amounted to approximately $17,450 and on that day her account was credited with $13,847.63, the amount of the dividends on 82 1/2 shares of Southeastern common stock theretofore received by petitioner. The debit balance had arisen because of amounts set up as due from Mrs. Hughes to petitioner for various properties conveyed to her by him. One such transaction involved the sale to their respective wives by petitioner and A. C. Shipman of their interests in a garage and office building which they had constructed jointly with their private funds. Mrs. Hughes made payment by giving petitioner three notes, one for $4,900 due 60 days from November 1, 1938, a second for $3,850 due six months from November 1, 1938, and a third for $3,621.94 due 15 months from November 1, 1938. As these notes matured, entries were made in petitioner's books, pursuant to petitioner's instructions, crediting Mrs. Hughes' account with the face amount of these notes plus interest, and the notes were canceled. In the statement which petitioner submitted to the Fulton National Bank on October 16, 1939, he listed as one of his assets an equity in this garage and office building in the amount of $7,371.93, *252 although as of October 16, 1939, only the third note of his wife in the amount of $3,621.94 remained outstanding. Mrs. Hughes never attended any stockholders' meetings of Southeastern; nor did she ever give any written proxy to petitioner. Stockholders' meetings of Southeastern were very informal and were usually held by Medlock, A. C. Shipman, and petitioner. On November 28, 1940, and December 16, 1940, the petitioner was the owner of the 82 1/2 shares of the stock of SoutheasternStage Lines herein involved. Opinion The Commissioner has determined that dividends of $8,250 on 82 1/2 shares of stock of Southeastern, declared on November 28, 1940, and paid on December 16, 1940, are taxable to the petitioner rather than to his wife to whom they were paid. The correctness of that determination presents the sole issue in this case; and the burden of proof is upon petitioner to overcome the presumption of correctness which attaches to the Commissioner's determination. Petitioner contends that his wife was the owner of the 82 1/2 shares of Southeastern on November 28, 1940, the date the dividend was declared, and on December 16, 1940, the date it was paid to her. His theory is that *253 his wife was the owner of 99 sahres of the capital stock of White Stage Lines, a corporation organized in 1930; that he was the owner of only one share of the capital stock of White Stage Lines; that upon the merger of White Stage Lines and Southeastern on January 1, 1934, his wife became the rightful owner of 82 1/2 shares of the capital stock of Southeastern and that he became the owner of only five-sixths of a share of Southeastern's capital stock; that the issuance of certificate No. 10, covering 83 1/3 shares of the stock of Southeastern on January 1, 1934, in his name was a mistake; that the cancellation on April 1, 1940, of certificate No. 14 for 82 1/3 shares standing in his name and of certificate No. 17 for 16 2/3 shares also standing in his name, and their replacement by the contemporaneous issuance of certificate No. 21 for 82 1/2 shares in the name of his wife and of certificate No. 22 for 16 1/2 shares in his own name, were in payment of the 99 shares of the capital stock of White Stage Lines which his wife surrendered on January 1, 1934; that she has been the owner of these 82 1/2 shares of Southeastern at all times since January 1, 1934, and specifically on November 28, 1940, and *254 on December 16, 1940; and that, therefore, the dividends on these 82 1/2 shares paid to her on December 16, 1940, are not taxable to him. It is important to note that petitioner never admits that he was the owner of these 82 1/2 shares at any time prior to April 1, 1940, nor contends that he made a bona fide gift of these 82 1/2 shares to his wife on April 1, 1940. The evidence pertaining to the organization of White Stage Lines is equivocal on the question whether petitioner's wife was the real owner of 99 shares of the capital stock of that corporation. [1] However, assuming that she was, a careful examination of the evidence covering the period from January 1, 1934, to April 1, 1940, would, in our opinion, also support the conclusion that petitioner was the owner of the 82 1/2 shares of stock of Southeastern herein involved on November 28, 1940, and on December 16, 1940. We note in connection with this latter conclusion the following facts: (1) Certificate No. 10 for 83 1/3 shares was issued in petitioner's name pursuant to a resolution of the stockholders of Southeastern to issue 83 1/3 shares to J. W. Hughes, and that the directors of Southeastern by an appropriate motion directed *255 the president and secretary to re-issue the shares of stock in Southeastern "in accordance with said resolution"; (2) as early as June 2, 1934, petitioner caused certificate No. 10 for 83 1/3 shares standing in his name to be cancelled and caused certificate No. 14 for 82 1/3 shares to be issued in his name and certificate No. 13 for one share to be issued in the name of R. M. Medlock; (3) petitioner received, appropriated to his own use and reported for Federal income tax purposes as his own, dividends declared on these 82 1/3 shares on November 11, 1936. April 20, 1937, December 10, 1937, and December 31, 1938; (d) petitioner included these 82 1/2 shares as part of his assets in a certified statement made on October 16, 1939, to the Fulton National Bank in connection with the obtaining of a loan; (5) petitioner's wife never attended meetings of the stockholders of Southeastern; (6) petitioner's action, in causing the cancellation of certificate No. 14 and its replacement by certificate No. 21 for 82 1/2 shares in the name of his wife, did not take place until April 1, 1940, and then under circumstances which render doubtful the plausibility of the explanation that payment was being *256 made to petitioner's wife for the 99 shares of White Stage Lines which she surrendered on or about January 1, 1934. The circumstances include (a) the cancellation on the same day (April 1, 1940) of certificate No. 9 for 83 1/3 shares of Southeastern standing in the name of A. C. Shipman and the issuance of certificate No. 19 for 75 shares in the name of Era Irene Shipman and of certificate No. 20 for 8 1/3 shares in the name of A. C. Shipman; (b) the fact that the interests owned or controlled by petitioner and his family in Southeastern and those owned or controlled by A. C. Shipman and his family were at all times equal in amount; (c) the pendency of the dispute between the Bureau of Internal Revenue and petitioner as to the taxability of the income of the trust, the corpus of which consisted of 150 shares of Southeastern, which trust was created by petitioner on December 30, 1938, for the benefit of his children; (d) the so-called sale of the garage and office building by petitioner and A. C. Shipman to their respective wives in November 1938, and then subsequent gifts of the notes due in payment thereof by petitioner to his wife. *257 We have in this case therefore a situation where even though we have assumed that petitioner's wife was the owner of the 99 shares of White Stage Lines from April 21, 1930, to December 31, 1933, nevertheless, the evidence requires the finding that petitioner was the owner of the 82 1/2 shares of Southeastern herein involved on November 28, 1940, and on December 16, 1940. Petitioner's contention that the issuance of certificate No. 10 for 83 1/3 shares of Southeastern in petitioner's name was a mistake is thus neutralized, because conceivably a gift from petitioner's wife to petitioner could have been made subsequent to January 1, 1934. In fact, there is some evidence in the record which tends to support such a theory. For example, the business of White Stage Lines was built up primarily by the efforts of petitioner. His wife contributed no services of any consequences to that company. Under such circumstances, it would appear more reasonable upon the merger of White Stage Lines and Southeastern that the 83 1/3 shares be issued to petitioner than that only five-sixths of a share be issued to him and 82 1/2 shares to his wife. However, we admit for the sake of argument, that the *258 question of how petitioner became the owner of the interests which (we have assumed) formerly belonged to his wife remains unanswered. It might have been by gift or by sale. Petitioner urges that it can not be said to have been by gift because section 53-506 of the Georgia Code provides as follows: A wife may give property to her husband, but a gift will not be presumed. The evidence to support it must be clear and unequivocal and the intention of the parties must be free from doubt. But as we pointed out under analogous circumstances in the case of Herbert L. Damner, 3 T.C. 638, 643, "* * * in this proceeding the taxpayer is confronted with the presumption of correctness attaching to the Commissioner's determination. The conflict of presumptions resolves itself in favor of the respondent, and the petitioner retains the burden of proof. Shea v. Commissioner, 81 Fed. (2d) 937." The burden of proof in this respect is upon petitioner to negative both the possibility that petitioner acquired the interests formerly owned by his wife and now represented by the 82 1/2 shares of Southeastern stock standing in petitioner's name, by a gift and the possibility that *259 petitioner purchased his wife's interest in these 82 1/2 shares. Petitioner, in our opinion, has failed to accomplish this in the instant case by a fair preponderance of the evidence. Any doubts appearing in the record - and this record is full of them - must be resolved against petitioner, Arthur M. Goodwin, 34 B.T.A. 485-492. This is particularly true where, as here, the over-all impression derived from a reading of the record is that we may be considering arrangements within families for the diversion of income which are "always subject to careful scrutiny and clear and convincing evidence is required to establish their bona fides." Harry C. Fisher, 29 B.T.A. 1041, 1048. Petitioner, as previously pointed out, does not contend that he made a gift of 82 1/2 shares of the capital stock of Southeastern to his wife on April 1, 1940. For that reason, the cases relied upon by petitioner, such as Richardson v. Smith, 102 Fed. (2d) 697; Bardach v. Commissioner, 90 Fed. (2d) 323; Marshall v. Commissioner, 57 Fed. (2d) 633; R. C. Coffey, 1 T.C. 579; Estate of Lorenzo W. Swope, 41 B.T.A. 213; Kathryn Lammerding, 40 B.T.A. 589; *260 Essie Irene Gaffney, Executrix, 36 B.T.A. 610, are not in point. Kell v. Commissioner, 88 Fed. (2d) 453 is also distinguishable from the instant case. Petitioner also cites the case of Bacon v. Bacon (Supreme Court of Georgia, 1925), 133 S.E. 512, for the purpose of demonstrating that inasmuch as petitioner's wife had been the owner of 99 of the 100 shares of the capital stock of White Stage Lines and through error 83 1/3 shares of the capital stock of Southeastern were issued for those 100 shares in petitioner's name, nevertheless, petitioner's wife "acquired a beneficial interest in 82 1/2 shares of said stock of Southeastern Stages, said number of shares being the proportionate part allocable to her." That case is not controlling here for a variety of reasons. First, the alleged holding in that case which is said to be relevant to this case, is to the effect that under the Georgia Code ( § 53-504) a husband can not purchase the property of his wife without an order authorizing the purchase, granted by the superior court of the county of the wife's domicile, and that in the absence of such an order, the sale of the wife's stock to the husband *261 would be altogether void and title would remain in the wife, who could recover her property if it be placed by her husband in his name instead of hers. However, upon examination, it appears that that holding is merely dictum, because the court went on to point out that what was involved in the Bacon case was not a contract of sale, which is governed by section 53-504 of the Georgia Code, but a contract of settlement and that "* * * though no sale of any of the wife's property may be had to her husband without an order of the superior court, there is no requirement that a female who happens to be a married woman will not be permitted to settle with her agent or to dissolve a partnership, except with the permission of the superior court; * * *." Secondly, petitioner may not rely upon section 53-504 of the Georgia Code to discharge his burden of proving there was no sale by petitioner's wife to petitioner of these 82 1/2 shares. Thirdly, even if we assume that there was no sale by petitioner's wife to petitioner of her interest in the 82 1/2 shares of Southeastern stock - a fact which, in our opinion, has not satisfactorily been established by the evidence - nevertheless, the petitioner *262 has not negatived the possibility of there having been a gift from petitioner's wife to her husband either at the time of the merger or subsequent thereto; and in this latter connection, the presumption, if any, created by section 53-506 of the Georgia Code is, as we have seen, inoperative. Finally, even if petitioner's wife acquired a beneficial interest in the 82 1/2 shares on January 1, 1934, it by no means follows, under the facts in this case, that she was the real owner of those shares on November 28, 1940, and on December 16, 1940. We, therefore, hold that petitioner has failed to sustain his burden of proof and that the Commissioner's determination must be sustained. Decision will be entered for the respondent. Footnotes
1. On the one hand two certificates were issued, one for 99 shares in the name of petitioner's wife and the other for one share in petitioner's name. On the other hand, the records of White Stage Lines pertaining to the issuance of these shares were not available; and Mrs. Hughes answered a question as to what she did with the money she had in the bank, by stating, "I gave it to Mr. Hughes to invest." (Emphasis [italics] supplied.)↩