Amos S. Bumgardner and Ann H. Bumgardner v. Commissioner. Amos S. Bumgardner v. Commissioner.
Amos S. Bumgardner & Ann H. Bumgardner v. Commissioner
Docket Nos. 40912, 40913.
United States Tax Court
1954 Tax Ct. Memo LEXIS 305; 13 T.C.M. (CCH) 128; T.C.M. (RIA) 54047; February 10, 1954
*305 Where the facts clearly show that the petitioner, a practicing orthodontist, established a dog kennel with the intention of making it a profitable enterprise and that he operated the kennel with the usual techniques associated with a business, held: The dog kennel was a business and the expenses incurred in its operation are deductible under section 23. Carlisle W. Higgins, Esq., 410 Reynolds Building, Winston-Salem, N.C., and F. T. Miller, Jr., Esq., for the petitioners. Stanley Schoenbaum, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion This proceeding involves deficiencies in income taxes for the calendar years 1947, 1948 and 1949 in the amounts of $2,050.35, $3,675.98 and $1,552.08, respectively. These deficiencies result from the disallowance of certain deductions in these *306 years attributable to expenses and losses from the operation of a dog kennel. The single question to be determined is whether the kennel was operated as a business during the years involved or whether it was petitioners' hobby. Findings of Fact The petitioners are Dr. Amos S. Bumgardner and his wife, who reside in Charlotte, North Carolina. Dr. Bumgardner is a practicing orthodontist and has been in active practice since 1924. For the calendar year 1947, he filed an individual income tax return, and for the calendar years 1948 and 1949 Dr. and Mrs. Bumgardner filed joint income tax returns. The returns for each of those years were filed with the collector of internal revenue for the district of North Carolina. Dr. Bumgardner had been interested in hunting most of his life and in bird dogs of field trial caliber for about 10 years prior to 1947. In the early stages of his enthusiasm for those dogs, he and his brother owned two dogs of mediocre class which they handled themselves with only moderate success for about three years. Following this venture, Dr. Bumgardner began to study the possibilities of establishing a first-class kennel of champion field trial dogs. Over a period *307 of approximately three years, he discussed the commercial feasibility of the idea with kennel operators and men who were recognized authorities in judging the qualities of such animals. One of his principal advisers was George M. Rogers, who for many years has been on the staff of the magazine "The American Field", the authoritative journal of those who closely follow the sport of field trials. Rogers is considered an eminent authority on the blood lines of those dogs and a judge of their ability in competition. In the course of his occupation, he attends the major field trials in the United States and Canada each year, reporting the events and the details of the sport. Dr. Bumgardner's second adviser was W. D. English, one of the leading handlers of bird dogs in major field trial competition. English had followed his occupation for almost 20 years when Dr. Bumgardner met him in 1940, and had a background of practical experience from the operation of his own kennel. English and Rogers both advised Dr. Bumgardner that, with the proper start, a kennel could become a sound business proposition. The core of their advice was that a successful kennel must have a champion sire and brood *308 matrons with champion lineage. Income would be obtained from stud fees for the services of the champion sire and by the sale of his pups produced by the brood matrons. In addition, they assured him that the area in the vicinity of Charlotte was an ideal location for a kennel and that, in their judgment, there was and would be a good market for those dogs. Their observations were that a champion sire could bring stud fees of as much as $7,500 in one year, and that $5,000 would not be unusual. The brood matrons could produce two litters of pups per year, bearing from four to seven pups per litter, and those pups could reasonably be expected to sell for prices ranging up $700to each. In 1943, Dr. Bumgardner commissioned Rogers and English to find a first-class dog with championship possibilities to head his prospective kennel. Rogers, because of his knowledge of blood lines and hereditary characteristics, was to make the initial selection, and English was to give the dog an actual trial and, when both concurred on the choice, they were to recommend it to Dr. Bumgardner. After more than a year of search, Rogers selected a dog called "Medic". The dog was shipped to English who observed *309 him in the field over a period of six to eight weeks and then recommended him to the doctor. Dr. Bumgardner purchased the dog for $2,000 and brought him to his kennel. Dr. Bumgardner then purchased a small tract of land on the outskirts of Charlotte. He built a small caretaker's residence on the tract and hired a man to supervise erection of the necessary kennels and other buildings and the care of the dogs. Six brood matrons were purchased and the dog Medic was bred to them from time to time. The total investment in the land, house, kennel buildings and dogs approximated $10,200. Medic was campaigned by English throughout the field trial seasons from 1944 through 1947. In that period he gained 18 placements in major field trial competitions, of which four out of the last five were championship victories. This qualified him for entry in the National Championship at Grand Junction, Tennessee, in 1948. This event is the highest on the ladder of competition and a win would establish Medic as the National Champion and his potentialities as a sire would be much desired. However, the dog failed to win because of the technicalities of the rules of competition and consequently did not *310 achieve the national prestige desired for him. During the years 1944 through 1949, Medic was mostly in the field campaigning with English. The prize money won in competition approximated $7,500, which went to English under the arrangement he had with Dr. Bumgardner. Occasionally English would take Medic to Charlotte to stay with Dr. Bumgardner for a period of about 30 days and then go back and take him again for further competition. Apparently, during these brief periods at home. Medic was bred to the available brood matrons in Dr. Bumgardner's kennel and during the years from 1944 to 1949 approximately 20 pups a year were whelped at the kennel. Most of them died because of a virus infection that persisted at the kennel despite the efforts of several veterinarians to curb it. Dr. Bumgardner even moved some of the sick puppies into his own home so that he could nurse them, but the losses continued. In 1948 the market for bird dogs and hunting dogs of a quality that would in a previous year have supported a sale price of at least $100 dropped to $20- $25. Consequently, for such pups as lived there was no market. Medic's failure in the national championship and the consequential limitation *311 on his ability to attract stud fees, coupled with the drop in the market for pups, made the kennel a losing operation. Dr. Bumgardner advertised the services of Medic for stud in "The American Field" in 1948 and 1949 and in the local newspapers but still the kennel was not successful. When the revenue from the stud fees and from the sale of pups did not materialize, Dr. Bumgardner concluded that he could not make a financial success of the kennel and he began the liquidation of his investment in 1949 and completed it in 1951. During the period of the kennel operation, Dr. Bumgardner was engaged continually and actively in his dental practice. The actual work of raising and the initial training of the pups was done by the caretaker under the supervision of English. Dr. Bumgardner never campaigned Medic in a field trial, leaving that duty to English who had many years of experience and was regarded as an outstanding handler. Dr. Bumgardner frequently attended the trials in which Medic was competing. Although he was not personally engaged in handling or raising the dogs, he did give considerable attention to the kennel operations. During the years in issue, Dr. and Mrs. Bumgardner *312 reported the following income: Professional
Year
Income
Rents
Dividends
1947
$36,976.35
$ 480.00
$3,477.75
1948
42,082.29
8,430.89
4,312.24
1949
21,810.78
12,031.70
1,441.76
No formal books were kept exclusively to show the receipts and expenditures attributable to the kennel operation. Payments for kennel expenses were made from a checking account upon which checks were also drawn in connection with petitioner's dental practice and for his personal affairs. Some kennel expenses were paid for in cash by the caretaker who made a rough voucher and turned it over to the doctor's secretary for reimbursement. However, there was a sufficient record in the checkbook stubs and in the vouchers to enable an accountant to make an accurate construction of the kennel income and expenditures which, for the years in issue, are as follows: Year
Income
Expenses
1947 $500
$6,184.59
1948
0
7,788.99
1949
700
3,847.67
During the years involved, the dog kennel was operated as a business. Opinion ARUNDELL, Judge: The respondent has determined deficiencies in petitioners' income taxes because he has disallowed certain deductions *313 for expenses attributable to the operation of a dog kennel. Petitioner, * who, during the years in issue, was actively engaged in the practice of his profession as an orthodontist, claims that the dog kennel was a business; contrarily, the respondent claims it was a hobby. If petitioner prevails, the expenses of his kennel are deductible in full under section 23 of the Internal Revenue Code. There is no dispute here over the basic facts involved. The parties only disagree on the ultimate question of whether all the facts and circumstances indicate that Dr. Bumgardner operated the kennel as a business or as his hobby. This Court and others have examined numerous situations where taxpayers have claimed the right to deduct the expenses of operating racing stables, dog kennels, or large farms, by contending that such activities were conducted as businesses and not for recreation or pleasure. The initial question in such cases has been to determine the intent of the taxpayer in establishing the enterprise. Edwin S. George, 22 B.T.A. 189, 195. *314 Usually, the profit motive indicates an intention to establish a business, and it need only appear that there was a reasonable expectation of profit, however hazardous the undertaking or scheme might seem to more critical observers. Commissioner v. Field, 26 B.T.A. 116, affd. (C.A. 2) 67 Fed. (2d) 876. Intention, being a matter of a state of mind, is rarely capable of being proved other than by facts and surrounding circumstances which corroborate and are consistent with a person's declarations. Foran v. Commissioner, (C.A. 5) 165 Fed. (2d) 705, 707. Consequently, in cases of this sort we have looked closely at the facts to determine whether the particular activity was initiated and conducted with the usual signs of prudence, attention to affairs and the techniques that normally characterize a profit-making business enterprise. Such indicia of intention as appear from the cases are: (1) a thorough preliminary exploration of the field and the possibilities of profit, Irving C. Ackerman, 24 B.T.A. 512, affd. (C.A. 9) 71 Fed. (2d) 586; (2) the consultation of experts and the hiring of qualified help or assistants, Margaret E. Amory, 22 B.T.A. 1398; *315 (3) considerable personal attention to the enterprise, Laura M. Curtis, 28 B.T.A. 631; (4) and, a businesslike method of accounting for income and expenses and concern for the economics of the operation, Wilson v. Eisner, (C.A. 2) 282 Fed. 38. (See, also, James Clark, 24 B.T.A. 1235.) On the other hand, where the facts show that the enterprise was established and conducted without meeting these tests and where it was indicated that social or personal reasons predominated in setting up the activity, we have held that the taxpayer was indulging in recreation or a hobby. Louise Cheney, 22 B.T.A. 672; Fisher v. Commissioner, 29 B.T.A. 1041, affirmed per curiam (C.A. 2) 74 Fed. (2d) 1014. With the above criteria at hand, we can consider the instant case. The facts establish clearly that Dr. Bumgardner undertook a fairly comprehensive survey of the economic aspects of his projected kennel before he made his initial investment in it. He sought the advice of respectable and eminent authorities on how to operate and the possibilities of success. These authorities testified at the trial. Being well established in *316 their calling, they had nothing to gain by testifying falsely. Petitioner relied exclusively on the advice of these experts in selecting the dog to head his kennel. He hired qualified help to take care of the routine operations of the kennel and a leading trainer to handle the potential champion dog in field trial competition. He personally gave considerable time to the operation of the kennel and actually brought some of the puppies into his home to nurse them. Moreover, he pursued businesslike techniques such as advertising the availability of his leading sire during the later years of the operation after the dog had proved himself in competition, and in keeping an account of the expenses of the operation. His records were accurate and sufficient to permit a reconstruction of income and expenses. (Cf. James Clark, supra.) And, when it became apparent that the kennel was and would be a losing proposition, Dr. Bumgardner liquidated his investment as promptly as could be expected. From a consideration of all these facts and circumstances, we conclude that Dr. Bumgardner established his kennel as a business and, therefore, the expenses incurred in its operation are deductible *317 under section 23. Decisions will be entered under Rule 50. Footnotes
*. Although for the years 1948 and 1949 Dr. and Mrs. Bumgardner are petitioners, we shall refer throughout to him as the only petitioner.↩