Thomas Ferrara v. Commissioner.
Ferrara v. Commissioner
Docket No. 23274.
United States Tax Court
1951 Tax Ct. Memo LEXIS 334; 10 T.C.M. (CCH) 141; T.C.M. (RIA) 51042; January 31, 1951
*334 William A. Arzalone, Esq., for the petitioner. Michael Waris, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: This proceeding arises from respondent's determination of deficiencies in income tax for the years 1942 to 1945, inclusive, of $1,286.10, $24,209.14, $25,772.10, and $13,213.67, respectively, and 50 per cent fraud penalties for the same years of $643.05, $12,156.01, $12,886.05, and $6,606.84, respectively. Certain adjustments are not contested. The issues are whether respondent correctly determined petitioner's income by the "net worth" method, and whether any part of any deficiency is due to fraud with intent to evade tax. Some of the facts were stipulated. Findings of Fact The stipulated facts are hereby found. Petitioner, a resident of New York, New York, filed his returns with the collector of internal revenue for the first district of New York. Petitioner and his wife are both 45 years of age. They married in 1923 and have two children, a son of 26 years and a daughter of 22 years of age. Petitioner's father came to this country in 1890. Neither of petitioner's parents could read or write. Petitioner's *335 father entered the retail fruit, vegetable, and grocery business. He operated the same retail store located in New York City, from 1907 to 1937. During the era of prohibition, petitioner's father sold homemade wine and bootleg liquor at the store. During the above period petitioner's father never had a bank account and never purchased any stocks, bonds or real property. He never filed any income or gift tax returns and left no estate upon his death. Petitioner was one of ten children. One brother and one sister have died. Three of petitioner's brothers have been confined in institutions as mental incompetents. Another brother, Frank, 40 years old and married, with no children, has been employed by petitioner since 1930. Petitioner has three sisters. Two sisters are unmarried and live with petitioner's mother who is 71 years of age, one sister being employed by petitioner. Neither petitioner nor his brothers or sisters attended any school beyond elementary school. Petitioner helped in the store as a boy, with his brothers and sisters. After graduation from elementary school petitioner continued to work for his father for about one year. Thereafter petitioner was employed in other *336 businesses for approximately five years. In 1925 petitioner went into business under the name of Allendale Farms, selling butter and eggs at retail from house to house. In 1927 he merged his business with that of another individual, and they formed Allendale Farms, Inc., to carry on a similar retail butter and egg business. Petitioner was employed by that corporation until March 31, 1937, when a voluntary dissolution occurred, petitioner receiving assets worth about $19,500. Subsequently petitioner invested those assets plus $500 in cash in a corporation named Pinebrook Farms, Inc., which he organized, to continue in the same retail business. The corporation engaged also in the wholesale butter, egg, and poultry business as a supplier of hotels and restaurants. Petitioner was president and principal stockholder. His annual salary for the years 1938 to 1941, inclusive, was approximately $4,000, $5,000, $7,000, and $7,800, respectively. During the period from 1927 through 1941 petitioner's only sources of income were the enterprises mentioned. Between May 24, 1939, and November 26, 1945, petitioner received short-term business loans, ranging in amounts from $300 to $6,300, from a *337 bank, on which he paid interest at rates varying from 2 1/2 to 4 per cent, and for which he used life insurance policies and government bonds as collateral. In connection with those loans petitioner submitted personal financial statements to the bank, on various dates during that period, which showed cash assets varying in amount from $4,153 to $7,868.70. A Selective Service Questionnaire, executed by petitioner under oath on May 27, 1942, stated that he had contributed during the preceding 12 months, $5,200 to the support of his family group, composed of his wife, son and daughter, and that he had contributed $700 and $300 to the support of his mother and mother-in-law, respectively; and that none of the above had received any other income during that period. Petitioner listed two one-family houses in response to a request to describe "all property, real and personal, owned by (or held in trust for) either myself or my dependents * * *." Petitioner stated in the questionnaire that it was his opinion that his classification should be 3A, and that the above dependents were very important to him. Petitioner was classified 3A on June 4, 1942, 3A on June 14, 1943, and classified 4A on *338 January 8, 1945. During the war petitioner's source of supply from whoesalers for his business became limited. He learned that he could purchase butter, eggs, and poultry in large quantities as a wholesaler from western suppliers. In June or July 1943 petitioner formed the Thomas M. Ferrara Co., which qualfied under O.P.A. regulations, as a primary receiver and distributor, and which sold to chain stores. Petitioner made an initial investment of $5,000 and made larger investments thereafter. He engaged in the wholesale butter, egg, and poultry business under that name until September 1945 when he organized Thomas M. Ferrara Co., Inc., which succeeded to the business. In 1944 petitioner pleaded guilty in the Federal District Court, to charges in two informations, of unlawfully selling poultry in 1943 and 1944 in excess of O.P.A. ceiling prices. Petitioner paid a fine of $4,303.76, served 15 days in a detention house, and received a suspended sentence of one year, being placed on probation. The violations were discovered by O.P.A. investigators from examinations of the books and records maintained by Pinebrook Farms, Inc., and Thomas M. Ferrara Co. Petitioner's customers were questioned. *339 No other actions have been brought. On April 1, 1947, Pinebrook Farms, Inc., and Thomas M. Ferrara Co. were consolidated into Thomas M. Ferrara Co., Inc. Thereafter petitioner received 65 1/2 shares of stock of the latter company, while 34 1/2 shares were distributed among petitioner's wife, son, daughter, mother, and his brother, Frank. The latter invested no money, and never had physical possession of his shares. The stock certificates were dated April 1, 1947, and signed by petitioner as president and his brother Frank as secretary-treasurer. Frank saw the certificates for the first time when he signed them in the early part of 1950. In January 1947 an examination of petitioner's books and records was begun by a revenue agent. On September 23, 1947, and again on December 10, 1947, petitioner stated to revenue agents that his father had saved money at home; that he had received $80,000 from his father between 1934 and 1937 which had been given to him as trustee for the whole family, with sole discretion as to its use; that he took the money to his home where he kept it; that no one knew he had received it; that he had invested a large portion of that sum in his business; and *340 that he had made a partial distribution in April 1947 by giving to himself, his wife, daughter, son, mother and brother shares of stock in Thomas M. Ferrara Co., Inc.
Petitioner expended for personal purposes in the years 1942 to 1945, inclusive, the respective amounts of $6,940.02, $11,633.97, $25,347.47, and $32,207.12. Petitioner's tax return for 1942 reported gross income of $7,730.36 and net income of $6,502.28, taking a depreciation deduction which was excessive by $160. His tax return for 1943 reported gross income of $19,622.39, with victory tax net income of the same amount, and income tax net income of $18,286.15, taking a depreciation deduction excessive by $160. His 1944 return reported an adjusted gross income of $37,563.11 and net income of $35,644.88. His 1945 return reported an adjusted gross income of $35,797.03 and net income of $32,916.43. No part of the deficiency for each of the years in controversy is due to fraud with intent to evade tax. Opinion We are not able to credit petitioner's testimony with respect to the funds which he claims to have kept concealed. Too many reflections on the plausibiilty of that story appear in the record for us to be willing *341 to accept it. Petitioner's testimony conflicted with declarations previously made to revenue agents, [1] was inconsistent with statements made on other occasions, [2] and supplied neither an adequate nor credible explanation. [3] We are accordingly unable to find the crucial evidentiary fact that petitioner possessed hidden cash which can now be relied on to account for his otherwise undisclosed sources of funds in the years in issue. Without such evidence the record is inadequate to sustain petitioner's burden of overcoming the presumptive correctness of respondent's determination. For this reason the issue with respect to the deficiencies based on income for the years 1943 through 1945 must be determined in respondent's favor. *342 When we come to the fraud question, however, we are confronted with an equal lack of persuasive evidence in favor of respondent, upon whom, of course, the burden rests on this phase of the case. James Nicholson, 32 B.T.A. 977, affirmed (CCA-8), 90 Fed. (2d) 978. It is not sufficient that we disbelieve petitioner. Some evidence to justify the conclusion that the deficiencies are at least in part due to fraud is a prerequisite to such a conclusion. We do not so regard a taxpayer's explanations, however inadequate. Arthur M. Godwin, 34 B.T.A. 485. There is not even a demonstration of illegal or unreported sources of income. For this the conceded O.P.A. violations will not suffice, since the only ones shown were discovered by examinations of petitioner's books of account, and those items were reported as part of the business income. We are accordingly likewise unable to make findings of fact to sustain respondent's determination of fraud due to the corresponding failure on his part to sustain the burden of proof in this respect. The fraud issue must be determined in favor of petitioner. Presumably, the deficiency for 1942 will fall with the *343 failure to sustain the determination of fraud. Current Tax Payment Act of 1943, section 6. Decision will be entered under Rule 50. Footnotes
1. Petitioner's story is that he received $80,000 in cash from his father in 1937, which the latter had kept buried in his cellar; to a revenue agent petitioner stated that he had received it between 1934 and 1937. At the hearing petitioner said that he had received it as an outright gift; to a revenue agent petitioner said that he had received it in trust for the family. Petitioner informed the revenue agent that he had kept the money at home; at the hearing petitioner said that he had placed it in his safe deposit vault except for about a week when he kept the money at home while wondering what to do with it. Petitioner informed the revenue agent that no one knew of his receipt of that cash; at the hearing he stated that his wife had known of it although she did not testify, and petitioner produced a brother and sister who, allegedly, had been informed of the gift by himself as well as by the father. The testimony of the brother and sister was contradictory in many details. ↩
2. Financial statements to a bank did not reveal the alleged hidden cash. Petitioner's statements of his resources in the Selective Service Questionnaire did not accord with his testimony. Apparently petitioner never filed a donee's information return at the time of the alleged gift of cash. ↩
3. Petitioner, a successful business man, operating several enterprises and maintaining savings and checking accounts, was asked why he had kept the money in the vault rather than depositing or investing it, and responded, "Well, I have no explanation for it." During the same period petitioner made bank loans upon which he paid interest and for which he assigned bonds and life insurance policies as collateral. And even petitioner's story leaves about $10,000 of increase in net worth unaccounted for during the period 1942 to 1945.↩