ARTHUR M. GODWIN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 61568, 70407. Promulgated April 30, 1936.

*Frank E. Seidman, C. P. A.*, and *Jacob S. Seidman, C. P. A.*, for the petitioner.

*Hartford Allen, Esq.*, and *Owen W. Swecker, Esq.*, for the respondent.

OPINION.

STERNHAGEN: The Commissioner determined the following deficiencies and penalties in the petitioner's income taxes:

| Year | Deficiency | Penalty |
|---|---|---|
| 1927 | $9,961.66 | $4,980.83 |
| 1928 | 15,224.25 | 7,612.13 |
| 1929 | 2,975.57 | 1,487.79 |
| 1930 | 4,564.13 | |

For each of the four years in question the petitioner's income has been increased by including the amounts of dividends upon shares of the Wolverine Bumper & Specialty Co. which the petitioner seeks to establish were shares owned by his wife as the result of a gift he made to her. The issue turns upon whether the evidence establishes that the alleged gift was made. Within this issue is a subsidiary question whether money received from the corporation in 1927 by way of redemption of preferred shares which had immediately theretofore been distributed by the corporation as a stock dividend is taxable as an ordinary dividend, because the redemption was essentially equivalent to the distribution of a taxable dividend under section 201 (g), Revenue Act of 1926. In the second issue, the petitioner assails the Commissioner's inclusion in his income for 1927, 1928, and 1929 of amounts determined to have been distributed to the petitioner individually by himself as trustee of a fund established by the Bumper Co. In the third issue, the respondent seeks to establish the fraud upon which rests his determination of penalties for 1927 and 1928, the penalty for 1929 being withdrawn by the Commissioner.

It can not be found as a fact, as the petitioner contends, that any of the shares of the Wolverine Bumper & Specialty Co. growing out of the petitioner's 1,532 shares owned by him on January 1, 1927, were owned by his wife during any of the years in question, or that he made a gift to her of any of the shares which he at any time in such years owned. The Commissioner has treated the dividends from all shares which appear on the books of the Bumper Co. in the name of either the petitioner or his wife as having been received by the petitioner, and it can not be found as a fact that any part of such dividends was not received by the petitioner.

It is found as a fact that the redemption by the Bumper Co. in 1927 of its preferred shares was at such time and in such manner as to make the distribution essentially equivalent to the distribution of a taxable dividend, as the Commissioner has treated it.

It can not be found as a fact that the petitioner did not receive as his own $5,224.56 in 1927, $7,554.87 in 1928, and $95.98 in 1929, as compensation for services in addition to the amounts for such years which he treated as income on his returns, all of which amounts were held by the Commissioner to be derived by petitioner from the trust fund established by the Bumper Co.

It can not be found as a fact that any part of the deficiencies for 1927 and 1928 is due to fraud with intent to evade tax.

It follows from the foregoing findings and omissions of findings that the Commissioner's determination of deficiencies for all of the years is sustained, and his determination of penalties is not sustained.

The evidence consists principally of the oral testimony of the petitioner and of his former secretary and of a large number of records. Much of the evidence is, because of inconsistencies, changes, and erasures, too doubtful to give any assurance of the facts. The petitioner was at the same time the vice president of the Grand Rapids Savings Bank and the secretary and treasurer of the Bumper Co. His secretary at the bank was also used to perform what he regarded as the details of his services for the Bumper Co. The assistant cashier of the bank was called upon to give the petitioner some advice as to his tax returns, although there is some doubt as to whether the petitioner gave him the necessary facts upon which a trustworthy opinion could be predicated. The petitioner's wife died in 1933, and her testimony was therefore not available in respect of the alleged gift. From a cloudy and elusive record, a statement will now be made of the evidence leading to the foregoing ultimate findings and conclusion.

On January 1, 1927, the petitioner, who was vice president of the Grand Rapids Savings Bank, was the treasurer of the Wolverine Bumper & Specialty Co., of which he had also been the secretary and with which he had been associated since its organization. On that date he owned 1,532 of its 25,326 outstanding shares. During the latter part of 1926 the corporation declared a stock dividend of three shares for one outstanding. Petitioner testifies that he then told his wife, early in February, that he would give her half of his stock when he received it.

When the new certificates were printed, about the middle of February, his secretary at the bank prepared certificate No. 102 in his name for 4,596 shares. He says he told his secretary before this that he had agreed to give one-half to his wife and that when he saw the certificate he told her to draw two certificates for one-

half of the number of shares to each. He signed the receipt on the stub and endorsed the single certificate. Nothing, however, was done about issuing the new certificates immediately, and there is some equivocal testimony as to whether the bookkeeper was or was not notified. The bookkeeper issued a single dividend check dated February 15, payable to the petitioner alone upon the entire 4,596 shares, and the petitioner, as treasurer, signed the check, then endorsed it and deposited it. He deposited it in a bank account which is now styled "Mr. and Mrs. Arthur M. Godwin", the "Mr. and Mrs." having been quite obviously added later upon some of the sheets of the bank's records. On March 25 another single dividend check was issued and similarly deposited. On April 15 two dividend checks in equal amounts were issued to petitioner and his wife, petitioner's being deposited in the aforesaid account and nothing appearing whatever as to the other. In May the secretary prepared two new certificates for 2,298 shares each, but on the stock stub, May has been erased and February 17 substituted, at the petitioner's direction. The secretary explains that the lapse from February to May in preparing the new certificates was caused by the absence of the stock book, which had been sent to the factory for audit, although it appears that she had the book on April 4 when she prepared other certificates. The revenue stamps attached to the stubs of the two certificates issued in May are marked canceled in February.

Petitioner testified that after the certificates were issued in May, he put his in his individual safe-deposit box and took his wife's home. She requested him to put her certificates in his safe-deposit box and he placed it there in an envelope marked with her name, which he says already contained bonds belonging to her. He alone had access to his safe-deposit box. From May 2 until October 14 dividends checks were issued separately in the name of each in equal amounts, and petitioner deposited his in the joint account. What was done with the wife's does not appear.

On August 30, 1927, the Bumper Co. changed its capital structure by issuing one common share of no par value and one-half preferred share for each outstanding share of common. These new common shares the petitioner says he directed to be issued in two certificates, one to "Arthur M. Godwin or Leona B. Godwin (either or survivor) & (owners in common)", and the other with the names in reverse order. Petitioner explains that he did not intend thereby to change the existing ownership, but only to avoid prospective inheritance taxes. He thereafter voted all shares, although he had no proxy from his wife and proxies were used at the meetings by others. The stub of the first of the two certificates for 2,298 new common shares shows an erasure of an original number of 4,596 shares. From the

appearance of the ink on this stub and the arrangement of the words, it may reasonably be inferred that the stub was written at various times.

The new preferred shares appear to have been issued October 6, 1927, in two certificates each for 1,149 shares, and both in the wife's name. The petitioner testified that he told his wife that he would give her his new preferred shares. She signed the stub receipts for them on October 12. These shares were redeemed almost immediately, and petitioner's wife in October received two checks for an aggregate of $23,387.90, which were deposited in her personal bank account and similar amounts almost immediately withdrawn.

Between October 14, 1927, and the end of the calendar year, five dividends were declared by the company, and each time there were issued to the petitioner checks either for $2,302 or for $2,332, and to his wife checks for $2,298. The inequality is unexplained, notwithstanding that certificates were issued to petitioner and his wife, "either or survivor and owners in common." There is a discrepancy in the dividend checks issued until October 11, 1928. On October 2, 1928, two checks for $2,332 and $2,298 were issued to "A. M. Godwin and Leona B. Godwin" and "Leona B. Godwin and A. M. Godwin", respectively. Thereafter, through November 11, 1930, single checks were drawn for the dividends in favor of "A. M. and Leona Godwin." These checks, no matter to whom payable, were, with a few exceptions, endorsed with petitioner's name, sometimes by himself and sometimes by his secretary. His wife is said to have had a commercial bank account, he a savings account (later made joint), and both a joint commercial account. The joint account was used for household expenses. Sometimes checks received were not deposited anywhere but were endorsed to the bank in payment of mortgages bought from the bank. The petitioner seems to have taken care of all the family investments. The dividend and redemption checks in the wife's name were deposited in her account, and the joint checks and those in petitioner's name were deposited in the joint account.

It appears that the first nine checks issued to the wife were not deposited. The tenth, that of October 14, was deposited in her account.

In 1929 petitioner rented a larger safe-deposit box which he made accessible to his wife. This went on until 1933, when his wife rented a separate box at another bank and transferred her personal securities to it. He then rented a smaller box at the Grand Rapids Savings Bank. The secretary seems to have thought that the separate boxes were rented in 1930 rather than 1933. She had access to the petitioner's safe-deposit box and when she went to it while the petitioner and his wife were in Europe she noticed an envelope marked with the wife's name. In 1929 the secretary heard petitioner tell his wife that

since she was getting the dividends from the Bumper Co. she would have to pay tax on them.

During 1927 the aggregate of dividend checks issued in petitioner's name was $27,196.40, and in his wife's name $24,358.80. In his 1927 tax return, petitioner reported $17,746 as such dividends and his wife $33,899.20. No one reported the $23,387.90 paid by checks issued in the wife's name in redemption of the preferred shares.

In 1928 dividend checks were issued to the petitioner aggregating $41,976, and to his wife $41,364, and to both jointly $27,780. Petitioner, in his 1928 return, reported $42,480, and his wife $68,640.

In 1929 dividends of $50,930 were paid by checks payable jointly to petitioner and his wife. In the 1929 separate returns petitioner reported $25,465 and his wife $25,465. In 1930 dividends aggregating $50,930 were paid to petitioner and his wife jointly, and they each separately reported $25,465.

In the Bumper Co.'s tax return for 1927, it is stated that petitioner, an officer of the company, owned 2,298 shares. On its returns for 1928, 1929, and 1930 the statement is that he owned 4,630 shares.

The petitioner says that the explanation of his allocation of the dividends as between himself and his wife on their tax returns is that he took the advice of the assistant cashier of the bank and understood that dividends received jointly or upon jointly owned shares could properly be "allocated" between the joint owners in any way that they saw fit, and that he divided the total amount in the proportion which he thought would result in the least tax. He omitted the payment in redemption of the preferred shares entirely, because the assistant cashier told him he thought it was merely a return of capital. He explains his later arbitrary division of dividends by correspondence with the collector and the Commissioner which he thought approved his treatment. The correspondence in evidence gives some support to this. Thereafter, in 1929 and 1930, he thought the Department had changed its ruling and required an equal split of the dividends.

It is not necessary to expound the general rules of law underlying the recognition of gifts. These rules are easily discernible from many cases[1] which have been decided by the courts and the Board.

---

[1] White v. Bingham, 25 Fed. (2d) 837; Edson v. Lucas, 40 Fed. (2d) 398; Owen v. Commissioner, 53 Fed. (2d) 329; Marshall v. Commissioner, 57 Fed. (2d) 633; Jackson v. Commissioner, 64 Fed. (2d) 359; Dulin v. Commissioner, 70 Fed. (2d) 828; Estate of James F. Foster, 13 B. T. A. 496; George W. Dulany, Jr., 17 B. T. A. 486; Anna L. Dirksen, Executrix, 24 B. T. A. 1152; T. J. Primm, 28 B. T. A. 13; Blanche S. Ross, 28 B. T. A. 39; dismissed, 67 Fed. (2d) 989; J. D. Varnell, 28 B. T. A. 231; affd., —— Fed. (2d) —— (C. C. A., 6th Cir., mandate June 11, 1935); Walter F. Henningsen, 30 B. T. A. 301; Louis Schoen, 30 B. T. A. 1075; Adolph Weil, 31 B. T. A. 899; affd., 82 Fed. (2d) 561; Max R. Bardach, 32 B. T. A. 517 (on review C. C. A., 6th Cir.); Delight Ward Merner, 32 B. T. A. 658; dismissed, 79 Fed. (2d) 985; Oscar G. Joseph, 32 B. T. A. 1192.

The question here is primarily as to the force of evidence to prove affirmatively the gift which the Commissioner refused to recognize. The alleged donee of the gift is dead and the testimony from which intention can be gathered is that of the petitioner, supplemented in respect of a few slight details by that of his secretary. Whatever may have been the petitioner's intention in February, and however clearly he may have expressed that intention in his alleged conversation with his wife, the evidence quite clearly shows that nothing was done in February to perfect the alleged gift. Obviously an issue of shares in May antedated to February would not be a factual issuance in February. But even the May certificate is not shown to have been received by the donee, and revenue stamps are said to cover the place where she would have signed the receipt on the stub. The May certificate is the last certificate appearing in the stock book, and there is no limit of time when it may have been made out. Petitioner says that he took this certificate home to his wife and that she requested him to place it in his private safe-deposit box. Notwithstanding his alleged definite instruction to the secretary and her preparation of the certificate in May for 2,298 shares in the name of the wife, the secretary made out the new certificate of October for 4,596 shares in the name of the petitioner. He represented this number of shares at a stockholders' meeting in 1930, although at a meeting held in August 1927 he purported to represent in his own behalf only 2,298 shares. The minutes of this meeting were apparently prepared on different typewriters, which is sought to be explained by the statement that the corporation's attorneys prepared the minutes in blank and the secretary later filled them out. To explain another apparent inconsistency between the type of the first page and that of the last page of the minutes, the secretary thought that she might have changed the typewriter ribbon.

The use of the dividend checks after they were issued by the corporation is also in doubt and makes it impossible to know to what extent they were actually devoted to the wife's interest. The petitioner apparently had authority to endorse his wife's name to the checks and he argues such a power of endorsement for deposit is too common to be significant. The difficulty, however, is that as to such of the first nine checks as he endorsed, it does not appear that they were deposited to the wife's account, or indeed in any account. The bank's records as to the alleged joint account are thrown into doubt by the fact that some of the sheets contain the words "Mr. and Mrs." later added, while others of the sheets are still in the name of Arthur M. Godwin. The preferred redemption checks of $23,387.90 were deposited in the wife's account and immediately withdrawn. In the bank's records of the wife's account, it appears quite clearly that al-

though for her own use before October 1927 the amounts deposited and withdrawn were small, thereafter whenever a dividend check was deposited in her account there was an immediate check against it in almost the full amount.

Although there is some formal evidence, therefore, to support a holding of the shares in the name of the wife between May and October 1927, the evidence taken in its entirety leads quite reasonably to the conclusion that she never actually owned the shares or exercised any of the ordinary functions of ownership. The mere issuance of dividend checks in her name and deposit of them in her account loses its force as evidence of ownership of the shares in the light of the countervailing indications.

Since the burden of proof is upon the petitioner to establish by a preponderance of the evidence that the dividends were not his own, as the Commissioner has officially held, the doubts must be resolved against him. That there are, to say the least, substantial doubts appearing from the cold record alone seems clear. It may be added that the impressions derived of the petitioner while testifying as a witness do not serve to remove these doubts or resolve them more favorably to him than the written record.

Upon the question whether the redemption of the preferred shares was essentially equivalent to the distribution of a taxable dividend so as to require that the money received therefor be taxed as a dividend as provided in section 201 (g), the evidence fully supports the application of the section. It appears only that the redemption took place almost immediately after the issuance of the preferred because the president thought that the capital represented by the preferred was not needed in the business. This is enough to justify treating the redemption as a mere device for the distribution of earnings, *Hyman* v. *Helvering*, 71 Fed. (2d) 342; *Hill* v. *Commissioner*, 66 Fed. (2d) 45.

We come then to the so-called trust fund and the amount thereof which the Commissioner has treated as withdrawn by the petitioner in excess of the amount which he showed on his return. It is said that the corporation had an agreement with its president to pay him 10 percent of the profits in addition to a fixed salary; that in 1927, the profits were unusually large and the directors did not want the factory employees to know how large an amount the president would receive; that they therefore set aside $65,000 and resolved that "the treasurer be authorized to pay up to $65,000 for extra salaries, commissions, and bonuses for the year closing September 1st, 1927." The exact amount of the president's 10 percent was $44,725.88, and the petitioner divided the $65,000 by giving the president his $44,725.88, giving himself $5,000, and giving Daane, a vice president, $5,000.

There was a further deposit of $175 made in the account on September 15, and thus the remaining balance was $10,449.12. This the Commissioner treated as divided between the petitioner and Daane. For 1928 the directors established "a fund of $100,000 * * * in the name of G. L. Daane, Trustee, to be used as commissions and bonus." In some way petitioner is said to have become a cotrustee with Daane. Of this fund, Clay was given $65,769.43, and petitioner and Daane each took $10,000. An additional $10,000 was later deposited in the account. The remaining $35,500 was withdrawn in March and July 1928 and March 1929, leaving a final balance of $250.81, and it is said that the account was closed by the withdrawal of this amount on February 14, 1929, which is a date prior to the withdrawal of $15,500 on March 21, 1929. Petitioner claims to have no knowledge of what became of these last withdrawals aggregating $10,449.12 of the 1927 deposit and $35,500 of the 1928 deposit, except that they were used, as they were said tacitly to be intended to be used, by the sales department for sales promotion. He says that this intention was stated in a directors' resolution, but there is no such resolution in evidence.

If, as we must suppose, this is the only evidence which the petitioner can offer to disprove the appropriation of the amount to himself which the Commissioner determined, it plainly falls far short of doing so. The petitioner was, by his own statement, a trustee of the fund and as such he was strictly accountable. It is not too much, therefore, to require that his statement as to the disbursement of the fund to the sales department be supported by the records which a fiduciary would normally keep in such circumstances. This requirement is at least as great in this proceeding as it was in *O'Laughlin* v. *Helvering*, 81 Fed. (2d) 269, which involved the cognate question of the disallowance of a deduction. It can not be said, upon the present record, that the respondent erroneously included the amounts of $5,224.56, $7,554.87, and $95.98 in the petitioner's income for 1927, 1928 and 1929, respectively.

The Commissioner, at the hearing, withdrew his claim for a fraud penalty for the year 1929, and this is therefore removed from consideration. The penalties for 1927 and 1928 are, however, insisted upon. Since the issue of fraud is involved, the burden of proof is assumed by the respondent, Revenue Act of 1924, sec. 907 (a), and Revenue Act of 1928, sec. 601. The 50 percent penalties may only be approved when the evidence affirmatively shows "that any part of the deficiency is due to fraud with intent to evade tax." The evidence can not be said to be such an affirmative showing. Mere doubt is not enough, nor does it follow that, because the petitioner is unable by proof to establish the ultimate facts upon which his contest

depends, the penalty for fraud must be sustained. It is conceivable from the present record that the petitioner, when he made his returns, actually believed, although mistakenly, that he had made the gifts to his wife, that the trust funds were in fact disbursed in sales promotion, and that he was not taxable upon them. The fact that we hold that he has failed to sustain these positions does not carry with it a presumption or an inference of fraud. The proposition of fraud must be separately and affirmatively established by the Commissioner. The doubts in the record which operate against the petitioner as to the deficiency because the burden of proof is upon him are also effective to operate against the respondent upon the issue of fraud because the burden is upon him. *L. Schepp Co.*, 25 B. T. A. 419, 436.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*