United Distillers (of America), Ltd. v. Commissioner. West Shore Wine & Liquor Co., Inc. v. Commissioner.
United Distillers (of America), Ltd. v. Commissioner
Docket Nos. 60897, 60907.
United States Tax Court
T.C. Memo 1959-46; 1959 Tax Ct. Memo LEXIS 202; 18 T.C.M. (CCH) 207; T.C.M. (RIA) 59046; March 9, 1959
Arthur Groman, Esq., and Maurice Austin, Esq., 350 Fifth Avenue, New York, N. Y., for the petitioners. John J. O'Toole, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: In these consolidated proceedings respondent determined the following deficiencies in additions to tax under section 293(b), I.R.C. 1939: Addition
Petitioner
Year Ended
to Tax
United Distillers (of
America), Ltd.
Sept. 30, 1945
$ 40,741.50
West Shore Wine &
Liquor Co., Inc.
Mar. 31, 1945
105,960.60
Mar. 31, 1946
370,733.54
The primary issue is whether petitioners filed, for the years in issue, fraudulent returns with intent to evade tax within the meaning of section 293(b), I.R.C. 1939. If this issue is answered in the affirmative, the following *203 questions must be decided: (1) Whether respondent had authority to issue the statutory notices of deficiency which give rise to these cases; (2) whether deficiencies in additions to tax under section 293(b), I.R.C. 1939, can be determined after the deficiencies in tax have been paid; (3) whether assessment of the deficiencies is barred by the statute of limitations; and (4) whether net operating loss carrybacks must be taken into account in computing additions to tax under section 293(b), I.R.C. 1939. Findings of Fact Some of the facts were stipulated and are found accordingly. Petitioner, United Distillers (of America), Ltd., hereafter called U.D.L., a Maryland corporation, filed timely returns for the year in issue on the basis of a fiscal year ended September 30, 1945 with the collector of internal revenue at Baltimore, Maryland. Petitioner, West Shore Wine & Liquor Co., Inc., hereafter called West Shore, a New York corporation, filed timely returns for the years in issue on the basis of fiscal years ended March 31, 1945 and March 31, 1946 with the collector of internal revenue for the third district of New York. West Shore changed its accounting period to the fiscal year *204 ended September 30 commencing with the short period of April 1, 1946 to September 30, 1946. United Distillers of America, Inc., a New York corporation, named A. Hammer Cooperage Corporation until 1946, hereafter called Cooperage, filed its returns on the basis of a fiscal year ended June 30 until July 1, 1946 when it changed to a fiscal year ended September 30. The books and returns of all of these corporations were prepared according to an accrual method of accounting and their inventories were valued at the lower of cost or market. Armand Hammer, hereafter called Hammer, and his brother Harry J. Hammer acquired the stock of Cooperage at the time of its incorporation in 1933. In 1943, Cooperage was inactive. Hammer and his brother purchased the stock of West Shore in October 1944 and that of U.D.L. on June 4, 1945. Throughout the years in issue, Hammer was the president of U.D.L., West Shore and Cooperage. In 1944, 1945 and all material parts of 1946, Government regulations prohibited the use of grains to produce whiskey or grain neutral spirits used in the blending of whiskey. Occasionally this prohibition was relaxed by the declaration of "grain holidays." Throughout these *205 same years the selling price of whiskey and neutral spirits was subject to maximum price regulations and orders issued by the Federal Office of Price Administration, hereafter called the O.P.A. During the periods in issue aged whiskey was a scarce commodity. A great part of the whiskey sold was blended whiskey, made by mixing a straight aged whiskey with neutral spirits. When whiskey blended with neutral spirits distilled from grain was freely available, whiskey blended with cane spirits or vegetable spirits was not marketable. Whiskey made with cane spirits was more acceptable than whiskey made with vegetable spirits. During periods of scarcity of grain spirits, it was possible to exchange vegetable spirits for aged whiskey by selling the spirits and buying the whiskey at O.P.A. ceiling prices. The conditions of supply and demand in the liquor industry for products such as cane and vegetable spirits and corn whiskey fluctuated frequently, depending largely on the actual or rumored imminence of grain holidays. Early in 1944 Cooperage entered the whiskey business through the purchase of American Distilling Co. stock and the receipt of dividends thereon in the form of 5,500 barrels *206 of aged whiskey. Cooperage had the whiskey bottled for its account, but found that it could not make a large profit on the sale of bottled aged whiskey because of existing O.P.A. regulations. It had not been in business in March 1942, the month ordinarily used as the basis for establishing ceiling prices. Hammer learned that by blending the straight aged whiskey with spirits, 4 barrels of blended whiskey could be made out of 1 barrel of straight whiskey. A chemist suggested to Hammer the possibility of manufacturing vegetable spirits from potatoes, a process which had never been tried on a commercial scale in the United States. Hammer obtained an option to purchase an old rum distillery in New Market, New Hampshire, from the Reconstruction Finance Corporation. He got in touch with Dr. Hanns G. Maister, an expert fermentologist then employed in Illinois by American Distilling Co., who had had many years of experience in Europe in producing neutral spirits from potatoes, and discussed with him the feasibility of producing potato alcohol at the New Market plant. Cooperage bought this plant in May 1944. Alterations and improvements were made to the New Market plant and it commenced *207 production around August 1, 1944 under Maister's supervision. The raw material used consisted of dehydrated potatoes which were unfit for human consumption and were obtained from the War Food Administration. The rated capacity of the plant for production of alcohol from grain was 5,000 proof gallons a day. The productive capacity by using dehydrated potatoes was from 130,000 to 204,000 proof gallons per month of 26 operating days, depending on the starch content of the potatoes. The Government declared an unlimited grain holiday for the month of August 1944, and according to information in the trade, the potential demand for vegetable spirits and whiskey blended with vegetable spirits disappeared, placing in jeopardy the entire investment in the New Market plant and in the large supply of potatoes purchased. Hammer, nevertheless, decided to continue producing vegetable spirits, and at the end of August 1944 full restrictions on grain distillation were reimposed. On October 20, 1944, Cooperage made a special application to O.P.A. for a ceiling price on the sale by it of vegetable spirits. O.P.A. wished at first to restrict the ceiling price to 59 1/2 cents per proof gallon, the *208 ceiling price on grain spirits, however it later granted a ruling fixing a ceiling price on the sale of vegetable spirits at $1 per proof gallon, exclusive of containers, transportation costs and Federal taxes. This ruling was effective up to December 31, 1944. The cost of producing vegetable spirits at New Market during 1944 and 1945 was in excess of $1 per proof gallon. On December 27, 1944, additional figures of costs of producing vegetable spirits were submitted to O.P.A., and on January 2, 1945 the $1 per proof gallon ceiling price on vegetable spirits was extended to March 31, 1945. Cooperage, in 1944, used the vegetable spirits which it produced for blending with aged whiskey secured from the American Distilling Co. dividends. Under the applicable O.P.A. regulations, a ceiling price for bottled whiskey was established at the price at which the same whiskey was sold or offered for sale in March 1942 by the same seller to the same class of customer. If the same whiskey was not sold or offered for sale in March 1942, the ceiling price was to be based upon the price at which the nearest comparable brand, type and age of whiskey was sold or offered for sale on that date. However, *209 because there was no March 1942 selling price experience on which to base ceiling prices for whiskey blended with begetable spirits, Cooperage had to compute its ceiling price on the basis of a formula which allowed no profit because it included the cost of the spirits at the ceiling price of grain spirits. In the fall of 1944, Cooperage applied to O.P.A. for an adjustment of the ceiling-price formula of its blended whiskey to take into account the higher cost of producing vegetable spirits. Such a ruling was obtained, effective June 25, 1945. West Shore had been in business as a distributor of wines and liquors to wholesalers and retailers in March 1942. By filing schedules of its March 1942 prices with O.P.A., West Shore had established, subject to examination, revocation and change by O.P.A., maximum prices for various brands of winess and liquors, including a whiskey brand known as Roamer. Cooperage produced vegetable spirits which it sold to West Shore at the ceiling price of $1 per proof gallon. It also sold to West Shore at its cost, which was its ceiling price, aged whiskey which it had obtained from outside sources. Until March 1945, the aged whiskey thus sold consisted *210 of whiskey obtained through the American Distilling Co. dividends. The aged whiskey and vegetable spirits purchased by West Shore from Cooperage were blended and bottled by Cooperage for account of West Shore as blended whiskey, at a small bottling charge which was regulated by O.P.A., and West Shore then sold the blended whiskey under the Roamer label within the ceiling prices. The whiskey was blended and bottled on order as West Shore made sales to its customers. The ceiling price on Roamer whiskey was high enough to yield West Shore substantial profits which constituted the bulk of the profits from its and Cooperage's operations. West Shore had limited distribution facilities, while Cooperage's range of sales distribution included most of the states. In the early part of 1945, Cooperage learned that O.P.A. permitted a fee to be paid to an appointed primary distributor. In February 1945, West Shore designated Cooperage its primary distributor for Roamer whiskey in territories in which Cooperage was listed as a distributor but in which West Shore was not so listed. Under this arrangement, Cooperage was to realize a primary distributor's fee of $1 per wine gallon on the Roamer whiskey *211 purchased by it from West Shore for distribution. On February 6, 1945, West Shore filed with O.P.A. an application for authority to establish maximum prices for sales of Roamer whiskey to primary distributors. O.P.A. then, for the first time, reviewed the ceiling prices for Roamer whiskey which West Shore had established. On March 2, 1945, the attorney for Cooperage and West Shore in O.P.A. matters informed Cooperage that O.P.A. objected to the ceiling prices on Roamer whiskey because West Shore's March 1942 prices seemed to have been for sales to retailers, rather than to wholesalers, and that these prices would not be applicable to the sales to wholesalers being made by West Shore in 1945. On March 12, 1945, West Shore received a formal notification of O.P.A.'s objection. On March 6, 1945, Cooperage entered into written agreements with National Distillers Products Corporation, hereafter called National, under which Cooperage agreed to sell to National, at O.P.A. ceiling prices, 500,000 proof gallons of vegetable spirits, to be delivered at the rate of not less than 50,000 proof gallons per month, and in exchange National agreed to sell to Cooperage, at O.P.A. ceiling prices, 125,000 *212 proof gallons of 3-to 5-year-old rye or bourbon whiskey, the sale of 62,500 proof gallons being contingent upon Cooperage delivering between 150,000 and 180,000 proof gallons of vegetable spirits within 90 days. National reserved the right to cancel until March 9, 1945, when it confirmed the contract as a firm commitment. Cooperage and West Shore's source of aged whiskey was through exchange arrangements of this kind. To convert into blended whiskey the 125,000 proof gallons of aged whiskey contracted for from National, Cooperage had to produce, for sale to West Shore, between 292,000 and 375,000 proof gallons of vegetable spirits in addition to the spirits required to be delivered to National. Hammer believed it would be possible to make deals with other distillers involving the exchange of vegetable spirits for aged whiskey. To be in a position to do so would require additional production of vegetable spirits. When the negotiations with National had commenced, Cooperage had started to spend money in enlarging the New Market plant. The capital expenditures for plant and equipment at New Market aggregated $108,522.73 at March 31, 1945, and additional capital expenditures from April 1, 1945, to *213 June 30, 1945, amounted to $9,672.01. Factory repairs and maintenance expenses at the New Market plant amounted to $61,681.86 from July 1, 1944, to March 31, 1945, and an additional $13,435.08 from April 1, 1945, to June 30, 1945. On February 15, 1945, Cooperage entered into an agreement with Aroostook Potato Products Co., under which Cooperage agreed to buy, at ceiling prices during the period March 1, 1945, to December 31, 1945, up to 30,000 tons of whole cull potatoes, unfit for human consumption, and to pay in addition a commission of $1 per ton. This agreement represented a commitment by Cooperage of approximately $248,000. In the months of January, February and March 1945, Cooperage entered into contracts with Commodity Credit Corporation for the purchase of 1,547,977 pounds of potato pulp. This represented a commitment by Cooperage of approximately $31,000 in addition to freight, demurrage and reprocessing costs. The 30,000 tons of whole potatoes contracted to be purchased under the Aroostook Potato Products Co. agreement were sufficient to produce about 1,100,000 to 1,200,000 proof gallons of vegetable spirits. The 1,547,977 pounds of potato pulp purchased from Commodity *214 Credit Corporation were sufficient to yield something less than 150,000 proof gallons of vegetable spirits. In March 1945, Cooperage and West Shore were having difficulties with O.P.A. about West Shore's ceiling price for the sale of Roamer whiskey blended with vegetable spirits to wholesalers, and to Cooperage as primary distributor, and about Cooperage's ceiling price for whiskey blended with vegetable spirits. Hammer was also concerned whether O.P.A. would extend beyond March 31, 1945, Cooperage's ceiling price on vegetable spirits. Hammer believed that if O.P.A. refused to extend this ceiling price, its refusal would, in all probability, not be applied retroactively so as to affect an invoice previously rendered for the sale of vegetable spirits, even though the merchandise invoiced had not yet been delivered. On March 31, 1945, the $1 ceiling price was extended without time limit but remained subject to revocation. Hammer was concerned over Cooperage's risk of loss of its investment in the New Market plant, in potatoes and in potato alcohol produced, if there should be a sudden change in restrictions that would make vegetable spirits undesirable or less desirable, and he felt *215 that these risks should be assumed by West Shore, which stood to make the great bulk of the profit arising from the National contract and from the production of additional vegetable spirits. Under his directions Cooperage invoiced 800,000 proof gallons of vegetable spirits at $1 per proof gallon to West Shore on March 10, 1945, and West Shore accepted the invoice. At the time of this invoice Cooperage did not own vegetable spirits in this quantity. West Shore did not have a warehouse for the storage of bulk spirits or whiskey. It was the practice between the companies that when Cooperage manufactured and sold vegetable spirits to West Shore, the spirits were to remain in the Cooperage plant and be blended by Cooperage with whiskey for West Shore's account, and Cooperage would then ship the bottled goods to West Shore's customers for West Shore's account, or, when Cooperage functioned as primary distributor for West Shore, Cooperage would ship the bottled goods to its customers and receive a primary distributor's fee from West Shore. At no time were vegtable spirits physically shipped to West Shore. The March 10, 1945, invoice stated "Stored at New Market, N.H. 800,000 Proof Gallons, *216 " but contained no reference to warehouse receipts, warehouse receipt numbers, inspection dates or barrel serial numbers, which, in the liquor industry, are invariably set forth on invoices for beverage spirits actually being delivered or physically in storage. The storage capacity of the bonded warehouse at New Market was about 150,000 gallons, and at no time during 1945 and 1946 were there stored at New Market more than 102,000 proof gallons of vegetable spirits. On March 31, 1945, 524 proof gallons were so stored. Hammer knew that it was not possible to store 800,000 gallons of vegetable spirits at New Market at any one time. Hammer did not know that the invoice stated "Stored at New Market, N.H." This language on the invoice was added by some employee without Hammer's instruction. In entering into the transactions with National and West Shore, Hammer relied on the opinion of Maister as to the capacity of the New Market plant to produce the spirits. The New Market plant's capacity to produce vegetable spirits ranged from 78,000 proof gallons per month, if whole potatoes were used, to 200,000 proof gallons per month, if dehydrated potatoes were used, and could have been more had *217 potato starch been used. An equal mixture of whole and dehydrated potatoes would have resulted in a productive capacity of 130,000 to 156,000 proof gallons per month. Hammer hoped to be able to maintain production with the use of equal mixtures of whole and dehydrated potatoes. Cooperage used dehydrated potatoes for the production of vegetable spirits rather than whole potatoes until March 1945. Prior to the use of whole potatoes, no difficulties had been experienced in production. With the commencement of the use of whole potatoes, many difficulties arose, including the smashing of potatoes by an inefficient conveyor system used for bringing the whole potatoes to the cooker, resulting in large losses of starch from which the potato alcohol was derived; failure to deal effectively with substantial quantities of stones present among the potatoes; and contamination of the yeast used for fermenting the material into alcohol. The resulting delays in production caused further production losses through rotting and consequent infection of potatoes waiting in railroad cars to be used. During the month of March 1945, Maister, who was then in Peoria, Illinois, received many and frequent telephone *218 calls from Hammer and from the manager of the New Market plant, asking for help and advice in clearing up the production difficulties. Hammer was greatly concerned about the output of vegetable spirits in the plant. Maister gave advice and help to Hammer and to the plant manager with a view to correcting the production difficulties, but without great success. Maister visited the New Market plant about 8 days at the beginning of April 1945, in order to correct the production difficulties. He was able to do a great deal, but many of the production difficulties continued. Maister expected to be able to bring the production up to the rated capacity of the plant in a month or two. Maister left his position with American Distilling Co. on May 1, 1945, and for a month acted as a consultant exclusively for Cooperage. On June 1, 1945, he became vice-president in charge of production for Cooperage and continued in the employ of Cooperage until June 1948. In April 1945, the Government established a "freeze" on the use of potatoes for beverage distillation purposes, which, for a time, prevented further deliveries of whole potatoes to the New Market plant. Hammer bought as much potato starch *219 as he could. This was not enough to maintain maximum production. Most of the starch obtained was delivered in a wet condition, which resulted in bacterial contamination that interfered with the alcohol yield. The difficulty of procuring potatoes was increased by a blight on potatoes and a resulting poor crop. Cooperage built a dehydration plant in New Jersey in order to dry whole potatoes that might be purchased and thus increase the yield of the plant. About March 31, 1945, Cooperage received several cancellations of orders for whiskey blended with vegetable spirits. Shortly thereafter, Hammer was advised by National that National wished to escape from its contract for 500,000 proof gallons of vegetable spirits. On May 24, 1945, a month-long grain distillation holiday for the month of July 1945, was announced. The total deliveries of vegetable spirits to National under its contract were 81,324.26 proof gallons. On October 1, 1945, Cooperage released National from its obligation to accept delivery of the undelivered balance, upon the sale by National to Cooperage, at O.P.A. ceiling prices, of the second 62,500 proof gallons of aged whiskey referred to in the March 6, 1945, agreements, *220 and under date of December 21, 1945, Cooperage sold National 102,758.11 proof gallons of vegetable spirits at 59 1/2 cents per proof gallon. The production of vegetable spirits, in proof gallons, at the New Market plant during each of the months of March 1945 through March 1946 was: 1945
Proof Gallon
March
68,596.0
April
29,297.3
May
44,232.7
June
27,001.0
July
2,164.1
August
4,604.1
September
22,545.5
October
47,691.5
November
18,168.4
December
None
1946
January
None
February
None
March
None
Total
264,300.6
Cooperage made shipments of vegetable spirits to National against the 500,000 proof gallon contract of March 6, 1945 as follows: 1945
Proof Gallon
March
50,140.50
April
10,500.30
May
15,557.56
June
5,125.90
Total
81,324.26
During the period from March 1, 1945 to March 31, 1946, Cooperage made deliveries of vegetable spirits to or for account of West Shore against the March 10, 1945 invoice as follows: 1945
Proof Gallon
March
11,965.35
April
16,211.28
May
26,557.68
June
6,464.30
Total
61,198.61
On October 10, 1945, Cooperage sold to Le Roux & Co. of Philadelphia 10,459.5 original *221 proof gallons of vegetable spirits at $1 per proof gallon without payment of Federal excise tax. Le Roux & Co. was not in the whiskey business. It was a cordial house which was experimenting with potato alcohol as a base for its cordials. It never made another purchase of potato alcohol. In May and June 1946, demand revived for whiskey blended with vegetable spirits. In July 1946, sales of such whiskey were made, one of the principal ones being to the Oregon Liquor Control Commission under a West Shore label known as American Bar. By this time the Roamer label had been used for whiskey with grain spirits and Hammer desired to keep it for that purpose so that the Roamer label would have value after the war. Cooperage also caused 252,948.39 additional proof gallons of vegetable spirits to be delivered to or for account of West Shore against the March 10, 1945 invoice, some of which were delivered by Cooperage and some by U.D.L. as follows: Proof Gallons Delivered By
1946
Cooperage
U.D.L.
July
3,078.90
23,894.40
August
52,458.32
47,437.59
September
20,237.26
18,474.54
October
20,776.79
41,563.87
November
4,398.09
20,628.63
Totals
100,949.36
151,999.03
*222 On December 5, 1946, the Oregon Liquor Control Commission canceled orders for 12,500 cases of American Bar whiskey blended with vegetable spirits. Cooperage had in its inventory at November 30, 1946, 194,196.20 proof gallons of vegetable spirits, of which 48,183.22 proof gallons were used in bottling whiskey and the balance was redistilled and sold as industrial alcohol. In the books of West Shore, and in its original Federal income and excess profits tax returns for the year ended March 31, 1945, the entire amount of the invoice of March 10, 1945 was recorded and reported as a purchase. On May 18, 19 and 28, 1945, West Shore made payments of $400,000, $350,000 and $100,000, respectively, to Cooperage, $800,000 of which was applied in payment of the March 10, 1945 invoice. On the same dates Cooperage made payments to West Shore in the same amounts. These payments were on account of invoices for purchase of other merchandise by Cooperage from West Shore. West Shore's books and its original Federal income and excess profits tax returns for the year ended March 31, 1945 reflected as inventory the undelivered balance of 788,034.65 proof gallons of the March 10, 1945 invoice at *223 a value of 59 1/2 cents per proof gallon, or a total of $468,880.62. This valuation was fixed by Hammer. West Shore's inventory at this date also included 24,670.73 proof gallons of vegetable spirits, theretofore delivered, at a value of $9.59 1/2 per proof gallon, including Federal excise taxes of $9 per proof gallon paid. The inclusion by West Shore of the undelivered portion of the invoice in purchases and in its inventory at 59 1/2 cents per proof gallon, as against the invoice price of $1 per proof gallon, resulted in decreasing by $319,154.03 the net income reflected in its books and the taxable net income reported in its original Federal income and excess profits tax returns for the year ended March 31, 1945. For several months prior to March 31, 1946, efforts had been made to sell vegetable spirits without success. On January 23, 1946, Cooperage wrote to the Harmar Company asking for an offer for vegetable spirits. On January 29, 1946, the Harmar Company responded stating that it was not interested in vegetable spirits in bond but would be willing to purchase vegetable spirits, tax paid, at $7 per proof gallon. This was less than the taxes of $9 per proof gallon that would *224 have to be paid to take vegetable spirits out of bond. Hammer concluded that vegetable spirits, not tax paid, had no value at March 31, 1946. At March 31, 1946, the undelivered portion of the invoice of March 10, 1945 consisted of 738,801.39 proof gallons, which had been included in the March 31, 1945 inventory at 59 1/2 cents per proof gallon. This undelivered portion was included by West Shore in its March 31, 1946 inventory at no value, which resulted in decreasing by $439,586.83 the net income reflected in its books and the taxable net income reported in its income and excess profits tax returns for that year. The same inventory included 52,974.13 proof gallons of cane spirits in the foreign trade zone at no value. Vegetable spirits were worth less than cane spirits. Before including the undelivered balances of vegetable spirits in West Shore's inventories at March 31, 1945 and March 31, 1946, and treating them as inventory that could be valued at cost or market, whichever lower, Hammer received the opinion and advice of William Griss, a certified public accountant. Cooperage's books for its year ended June 30, 1945 contain entries for the March 10, 1945 invoice and the deliveries *225 of $61,198.61 against that invoice. The invoice was recorded in the first instance as a sale, and thereafter in May 1945, it was canceled, in effect, by entering the sum of $800,000 as a purchase. In June 1945, the sum of $61,198.61 was entered as a sale. The net effect of the entries was that only the deliveries were recorded as completed sales. The entry of $800,000 as a purchase in Cooperage's books in May 1945 was made as the result of instructions given by Griss, who was the accountant for Cooperage. Griss did not discuss this entry with Hammer. He gave instructions to cancel the sale entry because no cost had been recorded in the books. He did not include in his instructions details as to how the cancellation should be effected. In March and April 1945, West Shore and Cooperage purchased approximately 100,000 gallons of Cuban cane spirits each. In June 1945, the demand for whiskey blended with cane spirits became active and Hammer decided that Cooperage should sell as much of this whiskey as it could under West Shore's Roamer label. Hammer was concerned with the continuing overhanging threat of the revocation of West Shore's O.P.A. ceiling prices for Roamer whiskey. He caused *226 West Shore to sell to Cooperage 50,000 cases of Roamer Special Reserve blended whiskey, all containing cane spirits, to be delivered as required, and directed that West Shore invoice Cooperage, which was done under date of June 14, 1945. Cooperage accepted the invoice, total price of which was $2,013,934.25, including Federal tax. At the time of this invoice, West Shore did not own, and there had not been produced for its account, Roamer whiskey with cane spirits in the quantity covered by the invoice. The invoice bore the notation "To be delivered as required." The necessary aged whiskey and cane spirits for the production of the whiskey covered were on hand, and Hammer intended that the whiskey so invoiced be produced and delivered in the future. During the month of June 1945, West Shore delivered to Cooperage 14,355 39/48 cases of Roamer whiskey, blended with cane spirits, against the invoice of June 14, 1945. The total price of these deliveries, including Federal tax, was $563,104.88, leaving an undelivered balance on the invoice at June 30, 1945 of 35,644 9/48 cases at a total invoice price of $1,450,829.37. No further deliveries were made after June 30, 1945. Under date of *227 January 25, 1946, the undelivered balance of the invoice was canceled. In the books of account of West Shore, entries were made concerning the June 14, 1945 invoice and the deliveries against it. The net effect of the entries was that only the deliveries were recorded as completed sales. In the books of account of Cooperage, and in its Federal income and excess profits tax returns for the year ended June 30, 1945, the entire amount of the invoice of June 14, 1945 was recorded and reported as a merchandise purchase, and the undelivered balance was included in the inventory at that date at the invoice price of $1,450,829.37, without any write-down. U.D.L. made purchases of whiskey from West Shore for sale in territories where U.D.L. was established as a distributor. U.D.L. had certain markets in the United States that neither West Shore nor Cooperage had. U.D.L. was made a primary distributor of West Shore and had the right to charge a primary distribution fee. It did not have this right on merchandise purchased from Cooperage. Hammer caused West Shore to sell to U.D.L. 10,000 cases of half-pints of Roamer Special Reserve blended whiskey containing cane spirits, to be delivered *228 as required, and directed that West Shore invoice U.D.L. which was done under date of August 24, 1945. U.D.L. accepted the invoice which bore the notation "To be delivered as required." The total invoice price, including Federal tax, was $414,100. At the time of this invoice, West Shore did not own, and there had not been produced for its account, Roamer whiskey with cane spirits in the quantity covered. The necessary aged whiskey and cane spirits for the production of the whiskey covered by this invoice were on hand, and Hammer intended that the whiskey thus invoiced be produced and delivered in the future. On September 21, 1945, West Shore made a delivery to U.D.L., against the invoice of August 24, 1945, of 2,852 cases of pints of whiskey blended with cane spirits, bottled by agreement under a different brand name, "Cooperage," at $34.82 per case, or a total of $99,306.64. This left an undelivered balance of 7,148 cases amounting to $314,793.36. No further deliveries were made. Under date of January 25, 1946, the undelivered balance of the invoice was canceled. The 2,852 cases of "Cooperage" whiskey delivered against the August 24, 1945 invoice were of similar quality, composition *229 and blend to the Roamer whiskey referred to in the invoice. The "Cooperage" whiskey with cane spirits was substituted for the Roamer whiskey with cane spirits, because "Cooperage" whiskey had a little lower price and Hammer thought that it could be sold more easily. The 2,852 cases delivered by West Shore to U.D.L. were sold by U.D.L. as follows: Cases
Price
Date of Sale
Purchaser
Sold
Per Case
Total
Sept. 25, 1945
Capital distributors
500
$32.59
$16,295.00
Oct. 25, 1945
Cooperage (and sold by the latter to the State
of North Carolina at the same price)
2,351
30.78
72,363.78
On November 15 and November 23, 1945, Cooperage sold to Penn Midland Corporation of Philadelphia, at $9 per proof gallon, 16 barrels of cane spirits on which the Federal excise tax of $9 per proof gallon had been paid. The value of cane spirits fluctuated during the period here involved. During September 1945, U.D.L. made payments totaling $414,100 to West Shore which were applied as payment of the August 24, 1945 invoice. During the same month, West Shore made payments totaling $424,165.25 to U.D.L. for purchases by West Shore from U.D.L., for tax payments advanced *230 by U.D.L. for West Shore's account, and for bottling charges made to West Shore by U.D.L. Griss was the accountant for U.D.L. He prepared the balance sheet, profit and loss statement and original Federal income and excess profits tax returns of U.D.L. for the year in issue. About the middle of November 1945, Hammer and Griss met to discuss U.D.L.'s financial statements. Hammer directed that the 2,352 delivered cases and the 7,148 undelivered cases be valued in the September 30, 1945 inventory on the basis of prices realized on completed sales. Griss advised Hammer that it was proper to include the undelivered merchandise in inventory and value it at cost or market, whichever lower, in view of the fact that the merchandise had been invoiced to U.D.L., that there was a substantial delivery, that payment had been made, and that Hammer was reasonably sure that transaction would be consummated. In the books of account of West Shore, entries were made concerning the August 24, 1945 invoice and the delivery against it. The net effect of the entries was that only the delivery was recorded as a completed sale. In the books of U.D.L. and in its original Federal income and excess profits *231 tax returns for the year ended September 30, 1945, the entire amount of the invoice of August 24, 1945 was recorded and reported as a purchase, and the undelivered balance of the invoice at September 30, 1945 of 7,148 cases, was included in inventory, together with the then unsold portion of the cases delivered. These cases were valued for inventory purposes at $100,000 less than the invoice price. Of this $100,000 reduction in value, $9,000 was allocated to the cases delivered and on hand, and $91,000 was allocated to the undelivered cases. The cases delivered and on hand were included in inventory at a total figure of $72,896.64, or $31 per case. The undelivered cases were included in the inventory at a total figure of $223,793.36, or $31.31 per case. The inclusion by U.D.L. of the undelivered portion of the August 24, 1945 invoice in purchases and the inclusion of the undelivered portion in its September 30, 1945 inventory at $91,000 less than the invoice price, resulted in decreasing by $91,000 the net income reflected in its books and the taxable net income reported in its Federal income and excess profits tax returns for the year ended September 30, 1945. In December 1945 *232 and in January and February 1946, there was a shortage of new, unused barrels for the storage of whiskey production. The only whiskey that could be stored in used barrels and show its age, or month and year of distillation, was corn whiskey. Because of the scarcity of new barrels, various barter deals became common. Cooperage did not have new barrels and, therefore, could not produce whiskey that would bear its age or date of distillation, other than corn whiskey. Cooperage, under date of December 7, 1945, entered into an agreement with Park & Tilford Import Corporation for the sale by Cooperage of 10,000 barrels of corn whiskey in used barrels of December 1945, and January and February 1946 production, and the sale by Park & Tilford to Cooperage of 1,250 barrels of 4-year-old whiskey. The 10,000 barrels of corn whiskey were delivered during the months of January through March 1946, and were billed at 73 cents per proof gallon. Of the corn whiskey delivered, 3,924 barrels were produced and delivered by U.D.L. and 6,076 barrels were produced and delivered by Cooperage. Hammer had not previously known of the possibility of exchanges involving corn whiskey. He thought that if an exchange *233 involving 10,000 barrels of corn whiskey could be made with Park & Tilford, which was one of the smaller distilling companies, similar exchanges could be made with the larger distilling companies. Accordingly, Cooperage embarked on a program of expending production facilities for producing corn whiskey on a large scale. Hammer instructed Maister to make Cooperage's existing plants and U.D.L.'s plant ready for the production of corn whiskey. Only small changes were required to make U.D.L.'s plant ready for production. Its capacity was 650,000 proof gallons per month. The capacity of the New Market plant for the production of corn whiskey was 200,000 proof gallons per month. These plants produced corn whiskey during December 1945 and January, February and March 1946. In December 1945, Hammer gave Maister instructions to convert the industrial alcohol molasses distillation plant which Cooperage had acquired at Gretna, Louisiana, into a registered grain distillery for production of corn whiskey. No other kind of whiskey could be produced economically at the Gretna plant, because whiskey produced in Louisiana, other than corn whiskey, was not salable. The O.P.A. ceiling price on corn *234 whiskey was 73 cents per proof gallon. The cost to produce it was approximately the same and, because of O.P.A. restrictions, Cooperage could not realize any substantial profit from the corn whiskey it produced or from the aged whiskey obtained in exchange for corn whiskey. The bulk of the profit to be derived from such aged whiskey would be derived by West Shore. Hammer was concerned over the risks to Cooperage of the loss of its investment in corn whiskey production facilities and in corn whiskey produced if, because of changes in grain restrictions or otherwise, new barrels should become plentiful and the demand and market for corn whiskey should disappear, and he felt that these risks should be assumed by West Shore. He caused Cooperage to sell to West Shore 60,000 barrels, amounting to 3,090,000 proof gallons, of corn whiskey at 73 cents per proof gallon, or a total of $2,255,700, and directed that Cooperage invoice West Shore, which was done under date of January 25, 1946. West Shore accepted the invoice. At the time of this invoice Cooperage did not own corn whiskey in this quantity. The grain quotas available to Cooperage during the months of February through June 1946 were *235 sufficient to enable it to produce more than 3,090,000 proof gallons of corn whiskey during those months, and Hammer intended that the corn whiskey thus invoiced be produced and delivered in the future. During the month of March 1946, Cooperage delivered to West Shore, against the invoice of January 25, 1946, 261,302.20 proof gallons of corn whiskey at an invoice price of $190,760.81. During April 1946, Cooperage delivered to West Shore, against the same invoice, a further 28,855.46 proof gallons at an invoice price of $21,064.49. Permitted grain distillation for beverage purposes during the months of March, April, May and June 1946 was reduced from 7 1/2 to 5 days per month, and later the permitted distillation for May, June and July 1946 was reduced to 3 days per month. With the reduction in grain distillation and consequent reduction in whiskey production, the strain on the supply of new barrels eased. The O.P.A. ceiling prices on new barrels were raised and this also increased the supply of new barrels. As a result, large distilling companies were willing to sell new barrels in exchange for assignment to them of grain quotas. When new barrels were available in which could be *236 stored newly produced bourbon whiskey, interest in corn whiskey dwindled. By the end of March 1946, there was no demand for corn whiskey. In West Shore's books and in its original Federal income and excess profits tax returns for the year ended March 31, 1946, the invoice of January 25, 1946 was recorded and reported as a merchandise purchase. During January and February 1946, West Shore made payments to Cooperage totaling $2,255,700 which were applied in payment of this invoice. Cooperage made payments totaling $2,520,290.79 to West Shore in January and February 1946 in payment of purchases made by Cooperage from West Shore. The 3,090,000 proof gallons covered by the January 25, 1946 invoice were included in the inventory of West Shore at a value of 48 cents per proof gallon which was fixed by Hammer. Of this total, 284,813.30 proof gallons were indicated to be represented by warehouse receipts and to be stored at specified locations. Hammer was of the opinion that the maximum value of corn whiskey was the cost of producing grain spirits, which was about 48 cents per proof gallon, in view of the disappearance of demand for corn whiskey and the fact that at March 31, 1946 he believed *237 its only utility was as a substitute for grain spirits. The inclusion by West Shore of the undelivered portion of the January 25, 1946 invoice in purchases and the inclusion of the undelivered portion in its March 31, 1946 inventory at 48 cents per proof gallon, as against the invoice price of 73 cents per proof gallon, resulted in decreasing the net income reflected in its books and the taxable net income reported in its income and excess profits tax returns for the year ended March 31, 1946 by approximately $700,000. In the books of Cooperage, entries were made concerning the January 25, 1946 invoice and the deliveries against it. The net effect of the entries was that only the deliveries of 290,157.66 proof gallons were recorded as completed sales. The total volume of sales of Cooperage, West Shore and U.D.L. was about $17,000,000 for 1945 and about $40,000,000 for 1946. By the end of 1946, the companies had acquired 9 distilleries. Hammer was the president of all these companies and was actively in charge of their operations. In 1946, the president of the bank from which Cooperage, U.D.L. and West Shore were receiving loans requested that consolidated financial statements *238 be prepared. Hammer was considering a public offering of stock in the Hammer liquor corporations at this time. In July 1946, he consulted Homes & Davis, certified public accountants, regarding retention of that firm as accountants for all the Hammer liquor companies, including Cooperage, West Shore and U.D.L., and to prepare consolidated financial statements. In the course of this consultation, discussion of the inventory practices of the corporations and of their intercompany transactions took place. Hammer related the facts regarding the March 10, 1945 sale of vegetable spirits, August 24, 1945 sale of Roamer whiskey and January 25, 1946 sale of corn whiskey, and the inclusion of the undelivered balances in inventory. He was advised that the accounting and income tax treatment of these transactions, and the inclusion in inventory of the undelivered balances of the invoices in question had been wrong, and that in view of the large amounts involved, amended returns should be filed. On August 9, 1946, Hammer instructed Homes & Davis to proceed with the preparation of amended returns. On September 13, 1946, West Shore filed amended income and excess profits tax returns, prepared by *239 Homes & Davis, for its fiscal years ended March 31, 1945 and March 31, 1946, and paid with interest the additional taxes reflected. The taxes shown by the original returns, amended returns and the additional taxes, exclusive of interest, paid upon filing of the amended returns, were as follows: Taxes Per
Taxes Per
Additional Taxes (Exclu-
Original
Amended
sive of Interest) Paid
Returns
Returns
With Amended Returns
Year ended March 31, 1945: Income tax
$ 9,618.55
$ 9,618.55
None
Declared value excess profits tax
341.52
37,805.41
$ 37,463.89
Excess profits tax
42,339.34
237,923.84
195,584.50
Totals
$ 52,299.41
$285,347.80
$233,048.39
Year ended March 31, 1946: Income tax
$ 44,381.09
$132,629.91
$ 88,248.82
Declared value excess profits tax
35,413.32
175,170.46
139,757.14
Excess profits tax
184,445.85
681,051.76
496,605.91
Totals
$264,240.26
$988,852.13
$724,611.87
On October 31, 1946, U.D.L. filed amended income and excess profits tax returns, prepared by Griss, for its fiscal year ended September 30, 1945 and paid, with interest, the additional taxes reflected. The taxes shown by the original returns, amended *240 returns and the additional taxes, exclusive of interest, paid upon filing of the amended returns, were as follows: Taxes Per
Taxes Per
Additional Taxes (Exclu-
Original
Amended
sive of Interest) Paid
Returns
Returns
With Amended Returns
Income tax
$ 36,697.60
$ 36,697.60
None
Declared value excess profits tax
None
None
None
Excess profits tax
208,289.20
272,696.78
$ 64,407.58
Totals
$244,986.80
$309,394.38
$ 64,407.58
In the amended returns of West Shore for the fiscal year ended March 31, 1945, the invoice of March 10, 1945 was included in purchases only to the extent of the deliveries received by March 31, 1945, and the portion of the invoice remaining undelivered at that date was excluded from purchases and ending inventory. In West Shore's amended returns for the fiscal year ended March 31, 1946, only the deliveries on the March 10, 1945 invoice received during that year were included in purchases, and the undelivered portion at March 31, 1946 was excluded from inventory at that date. The corn whiskey invoice of January 25, 1946 was included in purchases to the extent of the deliveries received by April 1946, and the balance *241 then remaining undelivered was excluded from purchases and from the ending inventory. In the amended returns of U.D.L. for the fiscal year ended September 30, 1945, the entire amount of the Roamer invoice of August 24, 1945 was included in purchases, and the portion of the invoice remaining undelivered at September 30, 1945 was included in the inventory at September 30, 1945 at the full invoice price. On September 11, 1946, an informant submitted information to respondent relating to petitioners, and as a result, respondent's agents commenced an investigation of petitioners' returns. This investigation was reviewed by respondent's special agent in charge, who recommended to the internal revenue agent in charge that the case be closed with the assertion of the addition to tax for negligence under section 293(a), I.R.C. 1939, in lieu of that under section 293(b), I.R.C. 1939. On May 19, 1949, petitioners and a representative of respondent signed forms 870, whereby petitioners agreed to the assessment of additional deficiencies over and above amounts assessed and paid under the amended returns, and both petitioners having been charged with negligence, West Shore further agreed to *242 the imposition of the addition to tax prescribed by section 293(a), I.R.C. 1939, upon the additional amounts reflected by both its amended returns and its form 870. These assessments were made by November 10, 1949. In 1952, a special board of review, appointed by respondent, recommended the reopening of the investigation relating to petitioners for the taxable years in issue, and further recommended that the addition to tax under section 293(b), I.R.C. 1939, be imposed in lieu of the addition which had been assessed and paid. On November 10, 1955, respondent issued the statutory notices of deficiency which give rise to this case. There was no evidence considered by respondent's special board of review additional to what had been before the special agent and revenue agent in charge in 1949. West Shore sustained, for the year ended September 30, 1947, a net operating loss of $312,315.72. The amount of the net operating loss as adjusted for excess profits tax purposes was $300,507.40. In computing West Shore's income, declared value excess profits and excess profits taxes due for the year ended March 31, 1946, respondent allowed the net operating loss as a deduction. He did not take *243 this net operating loss into account in computing the deficiencies in issue in additions to tax for fraud for the year ended March 31, 1946. U.D.L. sustained, for the year ended September 30, 1947, a net operating loss of $202,372.92. The amount of the net operating loss as adjusted for excess profits tax purposes was $194,240.66. In computing U.D.L.'s income, declared value excess profits and excess profits taxes due for the year ended September 30, 1945, respondent allowed the net operating loss as a deduction. He did not take this net operating loss into account in computing the deficiencies in issue in additions to tax for fraud for the year ended September 30, 1945. Hammer did not at any time intend to issue or cause to be issued false or fraudulent invoices to or from West Shore or U.D.L., and he did not at any time intend to make or cause to be made false or fraudulent entries on the books of West Shore or U.D.L. He did not at any time intend to file or cause to be filed false or fraudulent tax returns for West Shore or U.D.L., or to evade or defeat the taxes of West Shore or U.D.L. for 1945 or 1946. No part of the deficiencies in income taxes, excess profits taxes or *244 declared value excess profits taxes of West Shore for the years ended March 31, 1945 or March 31, 1946, or of U.D.L. for the year ended September 30, 1945, was due to fraud with intent to evade tax. Opinion The sole issue, fraud, being fundamentally one of fact, William W. Kellett, 5 T.C. 608, 616, is disposed of by our ultimate findings. The evidentiary circumstances, essentially undisputed as they are, give rise only to the critical question as to motive or state of mind of petitioners' controlling officer. Saven Corporation, 45 B.T.A. 343. On the entire record his purpose seems to us as consistent with innocence as with guilt. Indeed, there are implications that respondent regards his conduct as negligent, [1] a hypothesis not inconsistent with innocence. [2]Walter M. Ferguson, Jr., 14 T.C. 846. *245 That a nontax motive does not necessarily demonstrate an absence of fraudulent intent as to taxes may be granted. Emilie Furnish Funk, 29 T.C. 279, affirmed in part and reversed in part (C.A. 9) 262 Fed. (2d) 727 (Dec. 22, 1958). But the latter must still be shown to exist whatever the other purpose. Emilie Furnish Funk, supra at 294. This is not a case of long, continued and consistent understatements, cf. Arlette Coat Co., 14 T.C. 751; Lillian Kilpatrick, 22 T.C. 446, 458, affd. (C.A. 5) 227 Fed. (2d) 240; nor of false or fictitious entries of transactions that never occurred; cf. Chesterfield Textile Corporation, 29 T.C. 651; nor of failure to record income actually received. Cf. M. Rea Gano, 19 B.T.A. 518, 533; Chesterfield Textile Corporation, supra.
Respondent's case is founded exclusively on the intricacies of inventory accounting. We are not to be understood as suggesting that such procedures could not be a vehicle of fraud, still less than in this case petitioners' conduct is to be condoned as proper. But even gross negligence is not the equivalent *246 of fraud, Walter M. Ferguson, Jr., supra, and we must give petitioners the benefit of any failure of clear and convincing proof. In that posture of the case, respondent, upon whom the burden rested, section 7454, I.R.C. 1954, cannot be sustained. L. Glenn Switzer, 20 T.C. 759; Arthur M. Godwin, 34 B.T.A. 485, 493-494. Decisions will be entered for the petitioners. Footnotes
1. "* * * this was clearly contrary to correct tax reporting, and in this regard he intentionally disregarded and wilfully violated the provisions of the Internal Revenue Code." (Respondent's brief.) ↩
2. "SEC. 293. ADDITIONS TO THE TAX IN CASE OF DEFICIENCY. "(a) Negligence. - If any part of any deficiency is due to negligence, or intentional disregard of rules and regulations but without intent to defraud, 5 per centum of the total amount of the deficiency (in addition to such deficiency) shall be assessed, collected, and paid * * *."↩